## UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

IN RE:                              )
                                    )          Chapter 11
FINOVA CAPITAL CORP.,               )
                                    )          Bankruptcy Case No. 01-0698 (PJW)
            Reorganized Debtor.     )          Jointly Administered
                                    )
                                    )          Related Docket No.: 100

### MOTION OF THE OFFICIAL COMMITTEE OF EQUITY SECURITIES HOLDERS  FOR LEAVE TO APPEAL BANKRUPTCY COURT'S ORDER REGARDING DEBTORS' MOTION REQUESTING CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN

Without prejudice to its contention that the Bankruptcy Court's *Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan* [D.I. 100]*,* entered February 1, 2006 and annexed hereto as Exhibit A (the "Order") is a final order appealable as of right, the Official Committee of Equity Securities Holders ("Committee") respectfully moves the District Court pursuant to 28 U.S.C. § 158(a) and Fed.R.Bankr.P. ("Rule") 8003 for leave to appeal the Order.

Pursuant to Rule 8003, the Committee attaches its memorandum in support of this Motion, containing a statement of the facts necessary to an understanding of the questions to be presented by the appeal, a statement of those questions and the relief sought, and a statement of the reasons why leave to appeal should be granted.  Also pursuant to Rule 8003, a copy of the Order complained of as well as the related transcript and correspondence with the Bankruptcy Court pertaining to the Order are annexed to the memorandum.

WHEREFORE, for the reasons stated in the attached memorandum, the Committee respectfully requests that the Court enter an Order in the form attached granting it leave to appeal, and granting such further and other relief as justice shall require.

Dated: February 10, 2006
      Wilmington, Delaware

**BUCHANAN INGERSOLL PC**

*/s/ William D. Sullivan*

William D. Sullivan (No. 2820)
The Nemours Building
1007 N. Orange Street, Suite 1110
Wilmington, DE  19801
Tel:  (302) 428-5523
Fax:  (302) 428-3996
email: sullivanwd@bipc.com

-- and --

**ANDERSON KILL & OLICK, P.C.**

Mark D. Silverschotz, Esq.
James M. Andriola, Esq.
1251 Avenue of the Americas
New York, NY  10020-1182
Telephone: (212) 278-1000
Facsimile: (212) 278-1733

**EXHIBIT "A"**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | : | Chapter 11 |
| | : | |
| FINOVA CAPITAL CORPORATION, | : | Case Nos. 01-0698 (PJW) |
| | : | |
| Reorganized Debtor | : | Jointly Administered |
| | : | |
| _____ | : | Re: Docket No. 22, *99* |

## ORDER REGARDING DEBTORS' MOTION
## REQUESTING CLARIFICATION OF CONFIRMED CHAPTER 11 PLAN

This matter coming before the Court on the Motion of the Reorganized Debtor for

an Order Under Bankruptcy Code Section 1141 Clarifying Provisions of the Confirmed Plan,

dated April 1, 2005 [Docket No. 22] (the "Clarification Motion"),[1] filed by above-captioned

reorganized Debtor (the "Reorganized Debtor"); the Court having reviewed the Clarification

Motion and having heard the statements of counsel regarding the Clarification Motion and any

objections thereto at a hearing held before the Court on November 29, 2005 (the "Hearing"); the

Court having determined that the legal and factual bases set forth in the Clarification Motion

establish just cause for the relief granted herein; the Court having found that notice of the

Clarification Motion as set forth in the Order Approving the Form and Manner of Notice of the

Reorganized Debtor's Motion to Approve Form and Manner of Notice and to Limit Notice of the

Motion of the Reorganized Debtor for an Order Clarifying Provision of Confirmed Plan [Docket

No. 25] was sufficient under the circumstances and that no other or further notice need be

provided; and after due deliberation and sufficient cause appearing therefore;

---

[1] Capitalized terms not otherwise defined in this Order shall have the meanings ascribed to them in the Clarification Motion.

NOW, THEREFORE, IT IS HEREBY ORDERED THAT:

1. For the reasons set forth on the record at the Hearing [Docket No. 80] and in the Court's Letter to Counsel With Respect to Court's Ruling on the Reorganized Debtor's Motion for an Order Clarifying the Confirmed Plan, dated December 2, 2005 [Docket No. 78], the Clarification Motion is hereby APPROVED to the extent that the Debtor is presently and will be forever insolvent.

2. Nothing in this order shall be construed as a finding that the Debtors presently are or will forever be insolvent.

3. This Court shall retain exclusive jurisdiction to interpret and enforce the terms of this Order.

Dated: _____, 2006
   Wilmington, Delaware

_____
THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE

RLF1-2966062-2

**EXHIBIT "B"**

IN THE UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | Bankruptcy No. 01-0698 |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |
| FINOVA CAPITAL CORPORATION, | ) | Wilmington, DE |
| | ) | November 29, 2005 |
| Debtor. | ) | 2:31 p.m. |

TRANSCRIPT OF HEARING
BEFORE THE HONORABLE PETER J. WALSH
UNITED STATES BANKRUPTCY JUDGE


APPEARANCES:


For the Debtors:                MARK D. COLLINS, ESQUIRE
                               REBECCA L. BOOTH, ESQUIRE
                               RICHARDS, LAYTON, & FINGER, P.A.
                               One Rodney Square
                               920 North King Street
                               P.O. Box 551
                               Wilmington, DE   19899

                               JONATHAN M. LANDERS, ESQUIRE
                               JESSICA BASIL, ESQUIRE
                               GIBSON, DUNN & CRUTCHER, L.L.P.
                               200 Park Avenue
                               New York, NY   10166-1093

                               PHILLIP DONNELLY, ESQUIRE
                               THE FINOVA GROUP, INC.
                               Finova Capital Corporation
                               4800 North Scottsdale Road
                               Scottsdale, AZ 85251-7623


Olsen Industries:              MICHAEL W. BISHOP, ESQUIRE
(Via Telephone)                LOOPER, REED & MCGRAW
                               4100 Thanksgiving Tower
                               1601 Elm Street
                               Dallas, TX 75201


                               REGINA IORRI, ESQUIRE
                               ASHBY & GEDDES

```
                                    222 Delaware Avenue
                                    Wilmington, DE 19801


The Equity Committee:               MARK SILVERSCHOTZ, ESQUIRE
                                    JAMES ANDRIOLA, ESQUIRE
                                    ANDERSON KILL & OLICK, P.C.
                                    1251 Avenue of the Americas
                                    New York, NY 10020

                                    WILLIAM D. SULLIVAN, ESQUIRE
                                    BUCHANAN INGERSOLL, P.C.
                                    The Nemours Building
                                    1007 North Orange Street, Suite 1110
                                    Wilmington, DE 19801-1236


Audio Operator:                     SHERRY SCARUZZI


Transcribed by:                     DIANA DOMAN TRANSCRIBING
                                    P.O. Box 129
                                    Gibbsboro, New Jersey  08026-0129
                                    Office:  (856) 435-7172
                                    Fax:     (856) 435-7124
                                    E-mail:   Dianadoman@comcast.net
```

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.

1                          <u>I N D E X</u>

2

3      <u>ARGUMENT</u>:                                    <u>PAGE NUMBER</u>

4      Motion on Status Conference:

5            Ms. Booth                                     5

6            Mr. Bishop                                    5

7

8      Motion to Cease Setting Aside:

9            Mr. Landers                          7, 60, 73

10           Mr. Silverschotz                        22, 57

11

12     Motion to Increase Cap on Fees

13           Mr. Silverschotz                           72

14           Mr. Landers                                73

15

16

17     <u>RULINGS BY THE COURT</u>:

18     Motion on Status Conference                       6

19     Motion to Cease Setting Aside                 52, 72

20     Motion to Increase Cap on Fees                   76

21

22

23

24

25

1          (The following was heard in open court at 2:31 p.m.)

2          THE COURT:  Please be seated.

3          MS. BOOTH:  Good afternoon, Your Honor.  Rebecca

4    Booth of Richards, Layton and Finger, on behalf of Finova

5    Capital Corporation, the reorganized debtor in this case.

6          There are three matters on the Court's agenda for

7    today and we will be taking them in order.  The first item on

8    the agenda is a status conference in the matter of Olsen

9    Industries.  Essentially, the procedural posture, Your Honor,

10   is that Olsen filed a proof of claim alleging damages.  The

11   debtors filed an objection to the proof of claim and we have

12   been conducting discovery and moving forward towards a

13   resolution of that.

14         At the -- at this point, I think all we need to do

15   is present to the Court what we believe to be an agreed upon

16   form of scheduling order and request from the Court some trial

17   dates.  Finova proposes trial towards the end of July, early

18   August.  We believe that will provide sufficient time for the

19   Court to rule on any dispositive motions.  According to our

20   scheduling order, those would be due on April 13th of this

21   year.

22         Mr. Bishop from Looper, Reed and McGraw is on the

23   phone and this I already can introduce him.

24         MR. BISHOP:  Your Honor, Mike Bishop from the law

25   firm of Looper, Reed and McGraw in Dallas, Texas on behalf of

1    Olsen Industries, the claimant.

2              THE COURT:  Yes?

3              MS. BOOTH:  Your Honor, next year, not this year

4    obviously.

5              THE COURT:  Yes?

6              MR. BISHOP:  Your Honor, we have agreed to the form

7    of the stipulation and I believe Ms. Iorii has signed off on

8    that form of stipulation on our behalf.  With respect to the

9    trial setting, one of the concerns we have, Your Honor, is

10   that under the plan, the Court's aware that Finova's

11   continuing to liquidate assets and to the extent that

12   continues, I guess the concern is that there won't be

13   sufficient assets to pay the claim at the end of the day if

14   the Court ultimately allows a claim.

15             So, we would request a trial sooner rather than

16   later after the dispositive motion deadline.

17             THE COURT:  When is the dispositive motion deadline?

18             MS. BOOTH:  It's April 13th, Your Honor.

19             THE COURT:  How much trial time do you need?

20             MS. BOOTH:  The debtors would anticipate probably

21   two days, Your Honor.

22             MR. BISHOP:  I agree with that, Your Honor.

23             THE COURT:  Okay, let's try it for May 8 and 9.

24             MS. BOOTH:  Your Honor, I don't even believe that

25   provides sufficient time to complete briefing on the

Colloquy                                                    6

1    dispositive motions.  If the dispositive motions are due on

2    April 13th --

3             THE COURT:  Oh, okay, I thought the -- the briefing

4    would be completed by April --

5             MS. BOOTH:  No, I'm sorry, Your Honor.  We believe

6    the briefing to be completed in, you know, mid-May.

7             THE COURT:  Okay.

8             MS. BOOTH:  And will all due respect, these -- this

9    claim and the objection have been outstanding since 2001, so

10   we think that any urgency in having them resolved is not

11   necessarily fair.  We would request again, early August or

12   late July for a trial date.

13            THE COURT:  How about Monday, July 18 and Tuesday?

14            MS. BOOTH:  That would be fine, Your Honor.  Thank

15   you.  I'll write those dates into the stipulation and then

16   hand it up?

17            THE COURT:  Okay.

18            MS. BOOTH:  July 18th, Your Honor?

19            THE COURT:  Yes.

20            MS. BOOTH:  May I approach?

21            THE COURT:  Yes.  Okay.

22            MS. BOOTH:  Thank you, Your Honor.  The other two

23   items on the agenda relate to the debtor's motion to cease

24   setting aside 5 percent under the plan and the Equity

25   Committee's motion for an increase in their cap on fees.

1              I will let Mr. Landers from Gibson Dunn handle those

2    matters.

3              MR. BISHOP:  Your Honor, Mike Bishop on the phone.

4    May I be excused?

5              THE COURT:  Yes.

6              MR. BISHOP:  Thank you, Your Honor.

7              THE COURT:  I assume no one else is on the phone?

8              MS. BOOTH:  No, Your Honor.

9              MR. LANDERS:  Thank you, Your Honor. Jonathon

10   Landers and Jessica Basil, Gibson Dunn and Crutcher; Mark

11   Collins with Richards, Layton for Finova.  With me here today

12   is Mr. Rick Ross, who's the chief financial officer of Finova,

13   as well as Phil Donelly, who is the general counsel of Finova.

14             Your Honor, we're here on a motion to clarify the

15   plan with respect to the 5 percent distribution on account of

16   Equity, which the debtors believe cannot be made and can never

17   be made.  My presentation this morning -- this afternoon will

18   be in three parts.  First I'm going to talk about the

19   provisions of the plan.  Second, I'm going to talk about the

20   debtor's argument.  And finally, I'm going to talk about the

21   Committee's response.

22             The key plan provision is section 4.06(E)(v) of the

23   indenture, which is one of the plan documents.  It says that,

24   "The debtor shall apply cash to repay principal on the new

25   senior notes" -- and here's the critical language -- "and make

1  distributions to Finova Group" -- which is the parent --

2  "which Finova Group will use to make restricted payments" --

3  that's the term of (indiscernible) -- "unless a restricted

4  payment would be an impermissible restricted payment, in which

5  case Finova shall retain the amounts until the restricted

6  payments are no longer impermissible restricted payments."

7          As an aside, I'd observe that -- that there are

8  virtually identical provisions dealing with an event of

9  default.  If there's an event of default, the money is not

10 paid.  It's set aside until the event of default ceases.

11         Under the indenture, a restricted payment is defined

12 as a dividend -- any distribution on account of equity

13 interests, and that's key language, including the purchase,

14 redemption or acquisition of equity.

15         Then we turn to the definition of an impermissible

16 restricted payment.  An impermissible restricted payment is a

17 restricted payment that would render Finova Group insolvent,

18 would be a fraudulent conveyance, or which would not be

19 permitted under applicable law.

20         Then we turn to section 4.07 of the indenture, which

21 prohibits restricted payments unless authorized by section

22 4.07(B), which nobody has argued is applicable here, or

23 section 4.06, which is the section I just referred to.  For

24 the basic -- for the payments here, Equity must look to

25 section 4.06.

Argument - Mr. Landers

1          What to do these provisions essentially do?  Well,

2     they clearly define any payment to Equity whatsoever, as a

3     restricted payment.  A restricted payment is defined as

4     payment on account of Equity interests.  The second thing they

5     do, which is critical, is that they effectively condition any

6     payment on Equity interests to a bunch of conditions, which

7     makes it clear that shareholders do not have an absolute right

8     to payment.  That's the situation.  That's what the indenture

9     says and that's -- that's in essence, the structure that we

10     face.

11          Now, let me turn to the second area, which is the

12     motion.  The basis for the debtor's motion here was simple and

13     straightforward.  It is that the 5 percent payment was on

14     account of Equity interests.  That's what the indenture says.

15     It is that the 5 percent payment cannot be made now because of

16     the conditions to making a restricted payment.  We believe

17     that all three conditions that are conditions of a restricted

18     payment, cannot be satisfied; that is, insolvency, that the

19     payments would be a fraudulent conveyance, and that the

20     payments are not permitted under applicable law.

21          In that connection, Your Honor, we attach to our

22     original papers, both a declaration of Mr. Richard Ross, who

23     is here in court, as well as Finova's mid-year 10-Q statement.

24     Each of these documents showed that liabilities of Finova

25     exceeded assets by more than $1 billion and that the existing

Argument - Mr. Landers

1    assets other than cash would have to more than triple in value

2    in order that Finova would not be insolvent. Mr. Ross's

3    declaration showed that given the nature of the assets that

4    was simply impossible to occur and would not occur.

5        The Equity Committee hasn't, in any way, contested

6    that showing.  They did some diligence but I think in light of

7    the overwhelming showing, I think we understand why they did

8    not contest this.  So that I think we're in a situation now

9    where Finova Capital, under the -- I'm sorry -- Finova Group,

10   the parent, under the indenture, is never going to be

11   permitted to make these -- these payments.

12       Now, the plan itself did not provide specifically

13   for this contingency.  There is a provision in section 9.4 of

14   the plan, which we believe could be applicable by an analogy,

15   which dealt with unclaimed or undeliverable funds.  And it

16   says basically, that the funds revert to Finova after a year

17   and the claim or interest giving rise to the right to the

18   funds or claim on the funds, is extinguished or barred.

19       I think this is a common provision in plans and I

20   would not argue that it's directly intended to deal with these

21   situations but provides what I think is the only analogy that

22   -- that may bear on this situation under the plan.

23       Now in it's response, the Equity Committee has not

24   really contested the plan language.  They haven't said and

25   they haven't raised any question about financial condition.

Argument - Mr. Landers

1    They haven't suggested in any way that these conditions might

2    be satisfied or that the conditions themselves were ambiguous

3    in some way; none of these things.

4          And significantly, Your Honor, they haven't referred

5    at all to pages 41 and 42 of the disclosure statement, which

6    specifically specifies that distributions to stockholders will

7    be subject to meeting legal requirements permitting

8    distributions to stockholders.  It won't be paid if Finova

9    Group is insolvent.  And as we understand it, Delaware law

10   would, in this regard --

11         THE COURT:  I'm sorry.  You say page 41 and 42?

12         MR. LANDERS:  It's 41 and 42.  It's really on the

13   top of page 42 of the disclosure statement.

14         THE COURT:  I think I have a different copy of the

15   disclosure statement than you do.  Mine is docket number 3 --

16   I'm sorry, docket --

17         MR. LANDERS:  Yeah, I have --

18         THE COURT:  -- number 533.

19         MR. LANDERS:  I have the printed version, Your

20   Honor, of the disclosure statement.  It is under the section

21   "Special Risks for Equity Holders", and it's right at the end

22   of --

23         THE COURT:  Okay.  It's on page 48 of my copy.

24         MR. LANDERS:  Okay, thank you, Your Honor.

25         THE COURT:  And you're referring to --

1        MR. LANDERS:  I'm referring to right at the end

2    before the subsection (c) where it says, "subject to meeting

3    the legal requirements" --

4        THE COURT:  -- Okay, I see --

5        MR. LANDERS:  -- "permitting distributions to

6    stockholders."

7        THE COURT:  I see it.

8        MR. LANDERS:  Okay.  Thank you, Your Honor.

9        The Equity Committee has not referred at all to that

10   section, nor to the requirement that to make any distribution

11   to stockholders would require action of the Finova Board of

12   Directors.

13       Let me turn to the arguments of the Equity

14   Committee.  Essentially, Your Honor, when you go through their

15   arguments, all of them seek to ignore in one way or another,

16   the plain meaning of the document, and the conditions

17   precedent in the document to payment.  When you come right to

18   it, all of them say for one reason or another, we don't want

19   to follow those conditions.  We want something that we did not

20   get under the plan.  And all assume in one way or another,

21   that Equity has some sort of vested or unconditional right to

22   the funds, which is simply inconsistent with the plan

23   language.

24       First argument in the argument that the Equity

25   Committee makes is that the distribution is really a debt, and

Argument - Mr. Landers

1    not a distribution on account of Equity interests.  Initially,

2    Your Honor, the argument is contradicted by the express terms

3    of the plan, the definition of restricted payment.  The

4    indenture specifically says that the 5 percent goes to make

5    restricted payments and restricted payments are defined as

6    payments on account of Equity interests.  That's why they get

7    the money.

8          In addition, Your Honor, that argument confuses the

9    concept of obligation with -- with debt.  If you take that

10   argument literally, any obligation under the plan, even the

11   stockholders for Equity would be a debt because it's an

12   obligation.  The case law -- and we've cited the <u>Carrieri</u> case

13   -- suggests that there is a distinction between those cases

14   and in that case, the Courts specifically distinguish between

15   various rights of shareholders and -- and whether or not they

16   constituted claims and said that those were not claims even

17   though they were obligations.

18         In addition, Your Honor, this -- this provision, the

19   5 percent provision, has none of the characteristics of debt.

20   We've discussed those in our memorandum and in, very briefly,

21   Your Honor.  We don't have a note.  We don't have a fixed

22   obligation, we don't have interest payments, we don't have --

23   we would have to declare a dividend or a distribution on the

24   part of the Board of Directors.  These are characteristics of

25   equity interests, not debt.

Argument - Mr. Landers

1          In any event, even if in some sense it wasn't debt,

2     it would still be subject to the condition.  The Equity

3     Committee has not explained how we do away with the condition.

4     Well, then the Equity Committee's second argument is well,

5     we'll admit the condition but we believe the condition is

6     simply a priming restriction.

7          Well, first of all, Your Honor, that argument is

8     simply inconsistent with the language of the plan and with the

9     retention provision.  The indenture specifically says if you

10    can't make the distribution, you retain it.  There would be no

11    purpose in this case of simply retaining the money

12    indefinitely.  What purpose does it serve?  What objective

13    does it serve to say you've got to retain the money

14    indefinitely, unless it's a condition on ultimate payment.

15         The Equity Committee has not suggested a reason or a

16    meshing of their argument that it's simply a timing

17    restriction and the fact there is this retention provision.

18    And again, we turn to the fact that the same provision exists

19    with regard to a default.

20         Again, I think it's implicit in the plan that if

21    there's a default and it continues indefinitely, payment to

22    equity holders would never be paid.  And you've got the

23    identical parallel language for the default provision and the

24    situation where you have an impermissible restricted payment.

25         The debtor then turns and cites various cases that

1    deal with pay, when paid provisions in relationships between

2    contractors and subcontractors.  As we have suggested in our

3    papers, Courts have clearly distinguished those provisions

4    from ordinary conditions.

5         In fact, the <u>Otis Eastern</u>  case, which is cited on

6    page 13 of our memorandum, specifically deals with that issue

7    and specifically upholds a requirement that in order to get

8    paid, a subcontractor has to submit a lien release, which

9    incidentally, Your Honor, included a general release as well.

10   The Court said that condition had to be -- had to be followed.

11        I think if one goes back to the pay when paid

12   provisions, they originated in the case in the -- in the New

13   York courts which basically dealt with situations where a

14   subcontractor was suing on a surety bond and the surety was

15   asserting one of these pay when paid provisions.  And the

16   Court basically said look, that's just inconsistent with the

17   notion of a surety bond but that has to application to this

18   situation.

19        There's no attempt here, and the Equity Committee

20   has not suggested there's been any attempt to transfer risk to

21   a third party of somebody else's default.

22        Finally, Your Honor, the provision does not suggest

23   timing issue in any respect.  The Equity Committee says that

24   various conditions precedent are not favored, but again, we

25   have no ambiguity here, we have the -- the clear language of

1  the provision.

2          Then the Equity Committee says well, this would be a

3  forfeiture and everybody knows that the law disfavors

4  forfeitures.  Well, Your Honor, the problem with that argument

5  is that is proves too much.  Any condition of a payment of any

6  sort which is not satisfied, in those terms affects a

7  forfeiture in the sense that you don't get what you hoped to

8  get.  The issue is not whether it's a forfeiture or not, but

9  rather whether the condition has been satisfied.

10          In this case, the Equity Committee -- the equity

11  interests simply have no lien or security interest or

12  entitlement of a type that you can say is forfeited.  They

13  have a conditional right to payment, which condition was

14  simply not -- not followed.

15          Might -- the rule might be different as the Equity

16  Committee suggests of this ambiguity, but there is simply no

17  ambiguity on the conditional nature of the payment.  The

18  ambiguity or the uncertainty, if any there is, is simply what

19  happens if the condition not only cannot be satisfied, but can

20  never be satisfied.  But that's a separate -- that's a

21  different question from whether there is an ambiguity in the

22  conditional nature of the payment in the first instance.

23          The Equity Committee says that the plan should be

24  construed against the drafter.  Well, Your Honor, I'm not sure

25  that that's even applicable here.  Normally the cases they

1  cite are situations where equity interests are asserting that

2  -- that kind of -- I'm sorry -- where creditors who are

3  seeking rights under a plan, are seeking rights that the

4  equity interests say that they shouldn't have.

5       In this case, it's the equity interests that are

6  asserting this issue vis a vie creditors.  But in any case,

7  Your Honor, Finova really stands in the position of a

8  stakeholder here.  It doesn't benefit in some way, in the way

9  those cases addressed.  In this case, either Equity or

10 creditors are going to get the money; it's one or the other.

11 And that's where we are.

12      This is not a situation where, in some way, equity

13 holders are going to try to give creditors less than the

14 creditors think they're entitled to in order to get more under

15 -- under a plan.  The cases, in fact -- and these are cases

16 that are cited by the Equity Committee -- suggest that while

17 the cases that they cite are cited for the proposition that a

18 treatment under a plan creates a new obligation.  What those

19 cases also establish is that whatever the rights are under the

20 plan, the parties getting those rights under the plan are

21 stuck with those rights even if they're worse than what they

22 up.

23      For example, the <u>Consumers Realty</u> case, involved a

24 situation where the creditor was entitled to interest and

25 didn't get it under the plan.  Yet the Court said that they're

1   stuck with no interest.  Similarly, the <u>Penrod</u> case involved a

2   secured creditor who found that the lien was taken away by

3   virtue of Section 1141 of the Bankruptcy Code.  Again, the

4   Court said, well, you're just stuck with your -- your

5   treatment under the plan.

6          In addition, Your Honor, in this particular case,

7   the obligation to Equity did not replace debt; it replaced

8   equity.  In fact, it didn't replace anything.  It just gave

9   Equity certain conditional rights under the plan and it has

10  again, none of the characteristics of -- of debt.

11         The Equity Committee says, well, this is not a

12  dividend and cites various cases relating to that issue.  But,

13  Your Honor, we don't think that that makes any difference

14  because this is a distribution by the very terms of the plan

15  on account of equity.  And the disclosure statement makes it

16  clear that it is subject to legal requirements dealing with

17  distributions to shareholders.

18         Even if this is construed as some sort of return of

19  capital or something like that, Section 244(b) of the Delaware

20  Corporations Code specifically says that a reduction of

21  capital is not permitted if the remaining assets are

22  insufficient to pay debt.  In fact, Your Honor, the provisions

23  dealing with restricted payments are parallel in a very

24  significant way, the restrictions under Delaware law on

25  distributions to shareholders.

Argument - Mr. Landers

1       Not only has the Equity Committee not argued that

2   the terms of the plan permit these distributions, but in fact,

3   they've not argued that Delaware law permits these

4   distributions either.  To be sure, they have cited the

5   <u>Fulweiler</u> case, which dealt with whether the spinoff of GM

6   stock by DuPont, should be allocated to the allocated to the

7   husband or the wife under a divorce -- divorce decree.

8       But, Your Honor, that has nothing to do with the

9   question of whether DuPont could have conducted the spinoff as

10  a matter of corporate Delaware law in the first place.  That's

11  the issue here.  The issue is not what side of the ledger it

12  goes on once the funds are distributed.

13      Then the Equity Committee cites Section 170 of the

14  Corporations Code, which says that well, if you deliver a note

15  at a time when you could have declared a dividend, the note is

16  in effect, valid and should be paid.  And then they say, well,

17  this applies because the note, the obligation was, in effect,

18  delivered at the time of plan when Finova could have paid a

19  dividend.  Your Honor, again, that argument fails on multiple

20  grounds.

21      For one thing, in this particular case, a dividend

22  could not have been paid at the time of the plan because the

23  indenture specifically required -- required full payment of

24  the Berkadia loan before any amount was paid on the 5 percent.

25  What they are, in effect, arguing really, again proves too

1   much.  Their argument would be that any general authorization

2   to pay dividends at some point in the future takes the

3   dividends when paid out of the restrictions in Delaware law

4   governing the payment of dividends.

5         There's no indication that I know of that the

6   Delaware statute was intended to basically approve forever and

7   ever, dividends which are not declared but which might be

8   declared in the future.  And as I said before, in this

9   particular case before any distribution whatsoever was

10  distributed to shareholders, it would have to be approved

11  before the Board of Directors.  That simply did not happen

12  when any of these -- when any of these conditions could be

13  satisfied, nor can they be satisfied now.

14        Finally, the Equity Committee says -- says that the

15  plan provisions trump state law if there is an inconsistency.

16  That may be true, Your Honor, but here there is no

17  inconsistency because the plan specifically incorporates state

18  law.  The plan says you can't pay these things if there's a

19  fraudulent conveyance, state law, or it would not be permitted

20  by applicable law, which in this case would be the law of

21  Delaware.

22        So this is not a -- a situation where in some way --

23  this is not what I call a hell or high water provision where

24  the plan said you got to pay this 5 percent to Equity,

25  regardless of anything else.  It's not that kind of provision

1    at all.  It's a provision which is subject to conditions and

2    the conditions specifically incorporate state law.

3         Finally, Your Honor, the Equity Committee says that

4    because Finova chose to set aside the 5 percent in a

5    segregated account gives rise to some sort of constructive

6    trust.  Initially, Your Honor, I observed that there was no

7    segregation requirement under the indenture.  The indenture

8    simply says that the funds must be retained.  According to the

9    indenture, the funds could have been retained in a general

10   bank -- bank account just as well as in a separate -- in a

11   separate account.

12        But in addition, Your Honor, the case law that we've

13   cited establishes that Courts will generally not impose a

14   constructive trust when there is a specific agreement.

15   Instead, the constructive trust remedy is a remedy that's

16   employed when a party gets or retains something, that for a

17   legal reason or an equitable reason, really belongs to a third

18   party.

19        Here, however, Equity does not have a claim of

20   entitlement.  They have a conditional right to payment.  And

21   Equity is really trying to get funds which they are not

22   entitled to under the plan.  This is not a case where somehow

23   Finova got the funds by virtue of wrongdoing or fraud or

24   something like that.  And the Equity Committee has not

25   suggested any -- any such things.

1          Instead, it's simply a case where the Equity

2    Committee would like to obtain funds in a way that, in effect,

3    would require a skewing of the plan provisions and a total

4    disregard of the conditions to payment.

5          Let me conclude, Your Honor.  We believe that the

6    documents are crystal clear that the plain meaning of the

7    documents is clear that this is a restricted payment on

8    account of Equity.  It's subject to conditions and cannot be

9    made.  Therefore, not only can it not be made, but it never

10   can be made.  And therefore, we would urge the Court to grant

11   Finova's motion.

12          Thank you very much, Your Honor.

13          MR. SILVERSCHOTZ:  Good afternoon, Your Honor.  I'm

14   Mark Silverschotz from the Anderson Kill firm and I'm here

15   today with my colleague, James Andriola -- also from Anderson

16   Kill -- and William Sullivan from Buchanan Ingersoll.  And we

17   are counsel to the reconstituted Committee, the Equity

18   Security Holders of the Finova Group.

19          That Committee was formed by the U. S. Trustee at

20   Your Honor's discretion for the sole purpose of responding to

21   the debtor's motion to clarify, which I suppose is the first

22   time anyone has been asked to respond to clarify crystal clear

23   documents.

24          We came into being on the 10th of July and Your

25   Honor, the debtor's motion is ten pages long and there was a

1    flurry of motion practice back and forth after that was filed.

2    But if you ignore the intervening motions and just look at the

3    response of First Carolina, the debtor's reply to First

4    Carolina -- our papers and then the debtor's ultimate reply

5    papers -- we have about 100 pages of pleadings which cite, in

6    the aggregate, 117 separate decisions.

7         I am not going to march all 117 opinions but it's

8    appropriate that both the debtor and the Committee and First

9    Carolina cited all these cases because I think, fundamentally

10   we have an issue of law.  And Mr. Landers and I, I believe,

11   agree that we have fundamentally an issue of law.

12        The language of the plan is what it is, and the

13   disclosure statement and the indenture as well, state what

14   they state.  The really key operative documents, of course,

15   are the indenture -- and I agree with Mr. Landers there --

16   and the plan.

17         And I think Mr. Landers would agree there is no

18   intrinsic -- extrinsic -- excuse me -- evidence of which

19   certainly, we're aware that would demonstrate any expectation

20   on the part of any party that on the 9th -- excuse me -- on the

21   11th of September of 2001, terrorists would fly planes into the

22   Pentagon and the fields of Pennsylvania and the World Trade

23   Towers.

24        And why am I bringing that up?  A month prior to

25   that, Your Honor, the plan was uncontested as -- as we stood

1    before you and it was found feasible and it certainly was.

2    And it's important that we put the motion in context because

3    one significant component of the various transactions

4    contemplated by the plan was a $500 million tender that

5    Berkshire Hathaway was expected to make for the new senior

6    notes that were issued pursuant to the plan.

7         And we will recall that after 9/11, exercising what

8    it believed to be its contractual rights, Berkshire Hathaway

9    declined to tender the $500 million for the notes pro rata,

10   asserting, I believe, force majeure and the debtor

11   nevertheless, and I think appropriately, continued on with the

12   effectuation of the plan, which had already gone.  A final had

13   been substantively consummated.

14        And this plan is, as we all agree, a plan of

15   liquidation.  It provided for Berkadia management, it provided

16   the management fees, which we all know are substantial, and

17   creditors got under the plan 70 cents cash on the barrel head

18   and they got new senior notes in the amount of the balance of

19   30 cents.  And as Mr. Landers mentioned, the notes had an

20   indenture and fundamentally, it is the indenture why we are

21   here today.

22        In their motion, the debtor points to the waterfall

23   of payments that's laid out in the indenture and they say

24   we're insolvent, we will always be insolvent.  We therefore,

25   can never distribute the funds to Equity, so therefore, let us

1    take the cash that's on hand now.  It was $65 million;

2    presumably it has gone up somewhat.  And the addendum in their

3    motion and the form of order that they propose says they want

4    to use those funds to "pay expenses, debts and other

5    obligations".

6            However, I think more accurately and in fairness to

7    the debtor, as expressed in footnote 11 of their motion, they

8    -- they gently drop the point that the funds that have been

9    set aside for Equity are actually going to be used to pay

10   either principal or interest on the new senior notes.

11           So, as I stand here, Judge, I think contextually,

12   it's important to recognize that the effect, if not the formal

13   intent, of the motion is to use the funds that were set aside

14   for Equity to pick up.  And we think it's going to go up to

15   about $100 million dollars if we're lucky.  They're going to

16   pick up about one-fifth of the obligation that was declined by

17   Berkshire Hathaway when after 9/11 they declined to tender for

18   the notes.

19           So, what the debtor's really asking for here,

20   contrary, I believe, to what Mr. Landers said, is asking for

21   the Court, after the fact, after confirmation, after

22   substantive consummation, substantial consummation -- excuse

23   me -- first to shift the risk of that non-tender to the Equity

24   and secondly, because the 5 percent that we're talking about

25   is within the fifth tier of the waterfall, where 95 percent

1    goes to the note holders, is asking Your Honor to subordinate

2    that 5 percent to the 95 percent.  And of course, the 95

3    percent is paying the 30 percent that wasn't paid after the 70

4    percent was paid.

5         The indenture is silent with respect to what the

6    debtor is asking the Court to do and because of that, Your

7    Honor, we think, and for a variety of other reasons that we've

8    expressed in our papers that I'm going to go through quickly

9    -- and I'm not going to simply regurgitate my papers -- we

10   think that the debtor's not entitled to the relief, the

11   specific relief that's requested in the motion.

12        Our argument, Your Honor, is that the motion is

13   contrary to law and it should be denied for that reason.  And

14   if we pause the 100 pages and the 115 opinions, we think the

15   argument is fairly simple.  The language of the indenture

16   simply does not say what the debtor wants it to say.  At best,

17   it's ambiguous.  And the silence plays into that ambiguity.

18   It certainly emphasizes the ambiguity.

19        But either way, whether it's silent or not, the

20   payment of the funds reserved for equity is a payment of a

21   plan created contractual obligation.  And that obligation is

22   in the nature of a debt, not a dividend.

23        The debtor's solvency is not a condition precedent

24   to the payment in the fifth charge.  If the operative

25   documents had provided otherwise, we would not be here today,

Argument - Mr. Silverschotz

1  Your Honor, because we would have had an express condition

2  precedent that Mr. Landers has articulated.  But it exists in

3  the ether, it doesn't exist in black and white on paper.

4      And because of that ambiguity, whether of a

5  consequence of the document's silence or otherwise, the

6  language has to be construed in favor of the equity holders

7  because under New York law first, as a matter of contract law,

8  one does not construe ambiguous language to find a condition

9  precedent -- period.

10      Two, one does not under New York law under

11  contracts, construe ambiguous language to effect forfeiture.

12  Three, one does construe language against the drafter, and

13  four, one does construe a plan against a plan proponent under

14  traditional bankruptcy interpretation or more or less, basic

15  contract concepts.

16      The sub issues that, I think, exude from everything

17  Mr. Landers has said and everything I've said thus far and

18  probably will say hereafter.  We're down to, is it a debt and

19  is solvency a condition precedent to any and every

20  distribution of every sort contemplated by the plan,

21  contemplated by the indenture to the senior notes?

22      The waterfall of issues, as opposed the waterfall of

23  payments, is more or less, flows from those two concepts.  The

24  indenture contains that payment waterfall that Mr. Landers

25  went to right away, as well he should have.  The first

1    obligation under that waterfall is for the debtor to pay all

2    of its current debts.  The debts of its liquidation, the

3    associated costs, the obligations at the subsidiary level --

4    and let us recall it is the subsidiaries that are doing the

5    liquidating, paying their costs of liquidating.  And only if

6    they are able to generate positive cash flow, upstream the

7    funds to Group according to the 95/5 split.

8         The indenture says that it has to either distribute

9    or reserve the funds for equity within that fifth tier.  And

10   the 5 cents must be upstreamed according to the expressed

11   language in the indenture.  The end language in that fifth

12   tranche -- and I'll use the term tranche even though it's

13   probably technically inaccurate, but I'm stuck with it because

14   that's what I've written in my notes.  The end language at

15   that fifth tranche says, "Each incremental payment of 95 cents

16   pursuant to clause (a) shall require a distribution or

17   retention pursuant to clause (b) of 5 cents.

18        Now, the 5 cent language is interesting because it

19   says those funds are to be used "to make distributions in

20   respect of Finova Capital's equity interests held by the

21   company."  It says that those funds are then held and then

22   indenture says that if they are retained, "any such retained

23   amounts shall accumulate."  Now, Mr. Landers says what's the

24   point of accumulating those funds?  And that's a fair question

25   and I'm going answer that but I have to come around to it and

1    I will do that in a second, Your Honor.

2           Mr. Landers also points out that the indenture says

3    that if a restricted payment is impermissible, the funds shall

4    accumulate.  So, the core of the debtor's contention is that

5    if the funds were once moved up were forever more

6    impermissible, because they would either have paid, would

7    render them insolvent or be a fraudulent conveyance or

8    otherwise impermissible under Delaware law, then they could

9    never do it.  It's the debtor's contention that all three of

10   those apply.  It's our contention contrarily and I suppose,

11   inevitably, that none of them apply.

12          But we also believe, Your Honor, that even if all of

13   them apply and those funds simply accumulate, they're still

14   ours at the end of the day because the first tranche requires

15   everything to be paid.  The 2nd, 3rd and 4th tranches get paid

16   in order and then they get to the 5th tranche, and the 95 cents

17   goes to the creditors and the 5 cents gets upstreamed and held

18   for us.

19          The indenture is silent on what happens, even to an

20   impermissible restricted payment at the end of the day.  Now,

21   at the end of the day is an interesting concept.  And now I'm

22   going to explain why I think it's a significant concept, and

23   I'd like to posit what I'll call a hypothetical but I think

24   it's really something that should happen at the end of the

25   day.

1          Let us presume that the debtor liquidates out

2   completely and does a perfect job.  And there's a hundred --

3   and they continue to reserve the 5 percent and at the end of

4   the day, $100 million is sitting in a segregated account and

5   they've paid every last debt of every last subsidiary and

6   every claim has been resolved forever.  And all that's left is

7   cash that's been segregated, and some senior -- new senior

8   notes that are unpaid.  At that time, how would this motion be

9   considered?

10          In theory, Your Honor, the merits of the motion on

11  that happy day, the merits of the motion should and would be

12  in our view, exactly the same as they are today.  You have

13  creditors who got 70 cents in cash and 30 percent notes, who

14  hopefully will have been paid most of that 30 percent.  But

15  they would have been paid what they were paid out of the 95

16  cents and who already consented in the plan to the split

17  articulated in the fifth tranche, because that's the

18  indenturous part of the plan supplement the debtor points out

19  accurately -- the plan supplement as we always do -- was

20  incorporated into the plan.  And at the end of the day, we

21  have the 5 percent in the bank account and unpaid senior

22  notes.

23          What the debtor would have the Court do is

24  effectively take that 5 percent and subordinate below the 95

25  percent which is something that the plan did not do and the

1    indenture doesn't do.  We really think that the debtor has

2    gone through a somewhat extraordinary circumlocution to get to

3    that point, you know, articulating various legal theories,

4    particularly in the absence of express language, producing the

5    result that they seek.  And their argument is essentially, and

6    I'll come back to the word essentially, but taking it right

7    out of their papers, they're arguing that this is what common

8    sense requires and that the result is a consequence of the

9    implicit meaning in the plan.

10          Your Honor, we disagree because we think the history

11   of jurisprudence on our collective topics makes clear that

12   common sense means that if you intend for a material term to

13   be in a contract, you put it in.  And if you haven't, one, you

14   don't construe, under New York law, a condition precedent out

15   of gossamer, and two, you don't cause a forfeiture to result

16   as the consequence of an inference.  And that's what the

17   debtor's trying to do.

18          I've framed what we see as the legal issue and, Your

19   Honor, I'd like to just go right into, more or less, pure law

20   that we've all talked about.  And I want to complement the

21   debtor on their pleadings.  I thought, just as counsel to

22   counsel, I thought they were -- they did an excellent job.  I

23   think our's are pretty good, too.  And Mr. Landers got last

24   licks when he filed his papers earlier this month.  If I bring

25   up anything new it will be extremely minor and only in

1    response to something that he may have said in his last set of

2    papers.  And I said before, I'm not going through all 117 that

3    we've collectively cited.

4         There is much about which the debtor and the Equity

5    agree.  We agree the plan is a contract.  It embodies the plan

6    supplement, as I just said, and it binds the parties.  The

7    debtor, when they opposed Mr. Linden's motion to reconstitute

8    the Committee, said that the debtor's goal "is to expressly

9    state what is implicit in the plan and pursuant to applicable

10   law.  At most, the clarification motion seeks to resolve

11   ambiguity in the plan concerning the disposition of the

12   segregated funds."  And that's in the debtor's opposition to

13   Mr. Linden's motion and at page six of their opposition.

14        And a couple of pages later, they go on to say, "The

15   plan recognized that the payment to Equity of the 5 percent of

16   the amount otherwise allocable to the new senior notes, was

17   essentially a dividend."  And Mr. Landers, I believe, used the

18   word essentially during his presentation.  And I have a term

19   for essentially.  It is a weasel word, Your Honor, and I don't

20   think Mr. Landers is a weasel.  I think he's an excellent

21   attorney.  But anything can follow the word essentially.

22        We can say that the payments are essentially a

23   dividend.  We can say they're essentially a prune danish.  It

24   is either is a dividend or it is not as a matter of law.  And

25   we believe it is not.  But what we agree about is that the

Argument - Mr. Silverschotz

1    plan does not expressly state what the debtor wants it to say

2    and that the 5 percent allocated to Equity was not expressly

3    stated to be a dividend.  And we certainly disagree with the

4    notion that the debtor's contractual burden embodied in the

5    indenture is essentially anything other than a contractual

6    obligation creating a debt.

7         In reply to the First Carolina objection, the

8    debtor's said that, "The shareholders are not entitled to more

9    than what is provided for in the plan and to find otherwise

10   would provide an unjust windfall to the shareholders", and we

11   absolutely agree with that assertion.  And I'm sure the debtor

12   would agree that to give the note holders more than they were

13   given by the plan would similarly result in an unjust

14   windfall.

15        We also agree with the debtor, Your Honor, that the

16   contract -- that is the indenture included within the contract

17   that is the plan -- is governed by New York law.  And I'd like

18   briefly to run through some New York contract law.

19        And New York law provides that when one is alleging

20   that a result is implicit or essential, but not express, it is

21   a high bar indeed that must be cleared.  The New York Court of

22   Appeals says, "A party who asserts the existence of an implied

23   in fact covenant bears a heavy burden for it is not the

24   function of the Courts to remake the contract agreed to by the

25   parties, but rather enforce it as it exists."

1        And following on, "This is especially so where the

2    implied covenant sought to be recognized and enforced is of a

3    type not favored by the Courts."  And that's the Rowe versus

4    Great Atlantic and Pacific Tea Company, at 46 NYS2d 62.  That

5    opinion says that where a party is seeking the imposition of a

6    disfavored covenant, failure to impose the unexpressed

7    covenant, has to deprive the party of the "fruits of his

8    bargain" -- quote, unquote -- fruits of his bargain, nor it

9    could gain a judicial imposition.

10       And as I've said before, the plan gave unsecured

11   creditors 70 cents cash, 30 cents in notes.  The notes yield

12   7½ percent.  The notes are not in default.  Mr. Landers

13   alluded before to the default provisions in the indenture.

14   The notes are not in default today and that's important.  And

15   every penny that's been set aside thus far has been set aside

16   because the contract required it because there is -- there is

17   no default.

18       But the plan gave Equity 1/20th of the 30 percent --

19   5 percent of the 95 percent.  Or if you want to do the math

20   slightly differently, 1.5 percent of aggregate distribution,

21   on face at least, taking the notes at par, that was given to

22   the creditors.  So where the motion granted, who would be

23   deprived of the "fruits of their bargain"?  It's our view,

24   Judge, that it's not the creditors.  Not the creditors to whom

25   the debtor seeks to give the funds that have been set aside.

1    We think it's the equity holders who consented to the plan,

2    who didn't stage evaluation fight at confirmation, did dispute

3    the management fees, did dispute the coupon on the notes.

4    They got what they got under the plan.  The creditors got what

5    they got under the plan and we believe the fruit of our

6    bargain is the 5 percent up front where we sit pari passu with

7    the 95 percent distribution to Equity.

8            Fairly recently, the New York Court of Appeals again

9    -- and the New York Court of Appeals is the highest Court, for

10   reasons that no one has really explained to me, rather than

11   being the Supreme Court.  But the Court of Appeals said,

12   "Courts may not by construction add or exercise terms nor

13   distort the meaning of those used and thereby make a new

14   contract for the parties under the guise of interpreting the

15   writing."  And that's the Reese versus Financial Performance

16   Corp. case, citing the case with my favorite name of all the

17   117, The Vermont Teddy Bear Company, Incorporated, and that's

18   at 1 N.Y.3d 72

19           Your Honor, the debtor contends that solvency is an

20   absolute condition precedent to any distributions by the

21   Finova Group to its shareholders, even where those funds have

22   been properly upstreamed.  And even where the senior note

23   holders have received their 95 percent of the windfall.

24           Your Honor, the debtor is seeking to impose a

25   condition precedent that's not written in the papers.  And

1   under New York law, that relief is not available because we

2   referred before under the <u>Rowe versus A & P</u> case, among the

3   disfavored implied covenants are those that seek to imply a

4   condition precedent.  And in a federal case before Judge Duffy

5   in the Southern District of New York, in the <u>Lomaglio</u> case,

6   Judge Duffy noted that in New York, condition precedent

7   imposition is so disfavored that it wouldn't even be done

8   against the drafter, where the shoe on the other foot here,

9   Judge Duffy would not impose a condition precedent that wasn't

10  expressed, even against the drafter of the contract.

11       So, we think that our argument goes even further

12  because we think from the Court of Appeals is that the

13  language at issue doesn't create a condition precedent at all.

14  The language of the indenture that the debtor believes creates

15  this condition precedent, we think again, we think it's

16  created out of -- out of the ether, not out the language

17  because we believe, as Mr. Landers correctly described our

18  view, that the language in the indenture creates a question of

19  timing by the use of the word "when" rather than the creation

20  of the condition of precedent or an issue as to if or unless

21  certain conditions are met, the distributions would be made.

22       I'm going to come back to the word "when", Your

23  Honor, and that's going to be one of the points that I'm going

24  to make a fresh point later on.  But if you think about it,

25  Your Honor, when we talked about the position of the equity

1    funds in the hierarchy of the waterfall, the payment

2    waterfall, the timing restriction makes sense because those

3    funds really ought to be reserved until such time as it is

4    clear that the higher tranches of debt have been paid.

5          And if the consequence of the reservation is that

6    there is a measure of risk associated with the reservation of

7    funds, that is not borne by the 95 percent -- with respect to

8    the 95 percent received by the shareholders.  It should still

9    be at the end of the day, the funds are available but there

10   may be some risk associated with it and the segregated cash

11   should remain on hand.

12         Treating solvency as a permanent condition precedent

13   makes no sense because if the debtor, as I expect, will have

14   done everything right, and at the end of the day all those

15   higher tranches will have been paid in full from the other

16   $400 million in cash that they're holding onto right now.  And

17   the only party that remains that is contesting the

18   allocability of those -- that 5 percent is the party that's

19   already consented to it in the plan.

20         To suggest that the note holder creditors within the

21   same fifth tranche get a second bite at that 1/20 of the

22   distribution reserved for the equity shareholder creditors, we

23   think is not supported by the express language in the plan.

24   And it doesn't even make the common sense that the debtor

25   would suggest to Your Honor -- has suggested to Your Honor.

1           And to do it by implication in the absence of that

2    language is essentially to effect a subordination of the

3    similarly situated parties within that fifth tranche, and we

4    know under New York law, we don't do that.

5           Over the years, there's been a fair amount written,

6    and I confess that I even wrote an article once about the so-

7    called rule of explicitness.  And it's usually in happier

8    cases that we express the rule of explicitness, Judge, because

9    there's a question of whether or not post-petition interest is

10   susceptible to subordination in the absence of express

11   language that specifically talks about post-petition

12   interests.  And we know that in New York -- although in other

13   states it's not the case -- but in New York, the rule of

14   explicitness is still good law.  And that rule means that we

15   do not impose subordination clauses that haven't been written

16   out in black and white and we think that subordination by

17   implication is exactly what the debtor is arguing for here and

18   we think it's expressly contrary to the law of contracts in

19   New York.

20          We also think that in the presence of an ambiguity

21   in the documents, to effect the forfeiture of the funds set

22   aside on behalf of the parties who agreed previously to the

23   split, is independently disfavored -- and we talked about the

24   Rowe case again referring to disfavored clauses -- and

25   forfeitures are always disfavored, particularly so when it's

1    being done by implication.

2           The Oppenheimer case explained quite clearly the

3    difference between and expressed and an implied one.  It

4    basically adopts a combination of Williston and Restatement.

5    And where there's a disproportionate forfeiture, Oppenheimer

6    won't -- the law of New York is that you don't impose that

7    forfeiture where you have an ambiguous contract.

8           Now, what is the forfeiture that we're talking about

9    here?  The Restatement definition is more or less adopted by

10   the Court in New York in the Oppenheimer case.  And the

11   restatement says forfeiture is "the denial of compensation

12   that results when the obligee loses its right to the agreed

13   exchange after it has relied substantially as by preparation

14   or performance on the expectation of that exchange.  And

15   there's some editorial changes for grammar in  there, but

16   that's the language expressly out of Oppenheimer.  And that's

17   from Restatements, Comment (b) to Section 229 of the

18   Restatement (Second) of Contracts.

19          Your Honor, as I said before, the Equity voted for

20   the plan.  They voted to be diluted, they voted to accept the

21   benefits of the plan such as they were.  We think that's the

22   performance that can trigger a forfeiture or a concern for

23   forfeiture.

24          So, we believe that on our various uncontested

25   facts, the imposition of continued solvency as a condition

1    precedent where it's not expressed in the operative documents,

2    would cause that disproportion forfeiture to the shareholders

3    and we believe that the presence of solvency after all

4    creditors, save for the note holders, have been paid was not a

5    material exchange so you wouldn't be depriving the note

6    holders of a material value that they bargained for.  And we

7    think thus under the <u>Oppenheimer</u> case, the motion is not

8    according to law, not consistent with New York law and should

9    be denied.

10           Now, the debtor and we cite a lot of the same cases

11   and it should be no shock, and I'm sure will be no shock to

12   Your Honor, that we each read them in completely opposite

13   directions.  And the debtor cites the language in <u>Oppenheimer</u>

14   to the effect that where the operative language uses "if" --

15   in quotes -- or "unless and until", then it's appropriate to

16   find an express condition in everything that I've talked about

17   thus far.  Thus far falls by the wayside if there's an express

18   condition in the language.

19           The indenture doesn't use that language, Your Honor,

20   and it's important to read <u>Oppenheimer</u> and the indenture side

21   by side.  It says, "When the restricted payments shall no

22   longer be impermissible", and as we said before under the

23   <u>Grossman</u> case, when is a word of temporal impact only.  It's

24   not if and when and the debtor's asking Your Honor to read

25   into the document, really, a non-existent "if".  We think

1    again, that it produces -- the word "when" produces an issue

2    of timing, not an issue of right.

3          We have a disagreement about the impact of the

4    silence of the document, Your Honor, and in its final set of

5    papers, the debtor engages in really some furious backpedaling

6    away from the proposition that the plan is ambiguous.  And I

7    think it's not surprising that they're doing that because from

8    what we've seen, they really have to because the consequences

9    of ambiguity are not good for their arguments.

10          And they cite a variety of cases to the effect that

11    if a plan is otherwise clear, silence on a point, where

12    there's absolutely no other conceivable result, will not in

13    isolation produce ambiguity.  And I agree with that as a

14    proposition.  But I think as we've seen thus far, Your Honor,

15    it is a stretch to allege that these documents are so clear

16    that ambiguity cannot be read into them; not after 100 pages

17    of pleadings and 117 different opinions.

18          And the <u>Goldfield</u> case from the Court of Appeals in

19    New York also expressly notes the potential presence of

20    "ambiguity created by silence."  So, we think that the logical

21    syllogism that the debtor is stuck with, essentially flows

22    from that silence and the indenture's part of the plan.  The

23    indenture is silent on this particular point of concern.

24          Silence equals ambiguity in our case because the

25    operative documents are not clear.  The ambiguity is construed

1    against the plan proponent.  An implied condition precedent

2    can't be imposed.  Forfeiture, under the Restatement

3    definition, would be experienced by the equity creditors, not

4    by the senior note holders if the motion was granted.

5         So, we think the debtor's motion has to be denied

6    for each of these reasons and we haven't even gotten to the

7    issue of whether or not the obligation under the plan is a

8    dividend or a debt.  And First Carolina made, we think,

9    crystal clear in their papers from last summer, that the

10   obligation and the indenture to distribute or segregate the 5

11   percent that was -- the 5 percent that was slated for the

12   equity creditors in the indenture -- is a dead obligation.

13        And again, we agree with the debtor, the plan is a

14   contract.  We agree that the rights under the plan are

15   substituted for all the rights that existed prior to

16   confirmation.  Confirmation brings a new day and supervening

17   obligations between the parties.

18        And of course, we disagree with respect to whether

19   or not it creates a debt.  Let's go back to New York law, the

20   Trojan Hardware case from the Third Department.  That's an

21   intermediate appellate decision, Judge; not the Court of

22   Appeals, but still useful.  It says, "Debt is generally

23   evidenced by a contract and it is a readily discernible amount

24   which can be expected in the normal course of events to be due

25   and owing in the future, although the obligation has not yet

1    ripened."

2         Now, to the equity creditors, that sounds

3    suspiciously familiar.  Our debt is evidenced by a contract,

4    the contract being the plan.  The readily discernible amount

5    is the 5 percent of the amount distributed on account of

6    tranche five of the waterfall.  So, we think this debt, even

7    under the debtor's analysis, depending on the solvency of the

8    debtor or not, it's either a current obligation or it's due

9    and owing in the future.  But it's a debt, but it's not a

10   dividend.

11        And the debtor relies very heavily in their, I

12   think, in both sets of papers that followed the original

13   motion on the <u>Geftman</u> test -- the 16 steps of looking for a

14   debt.  But <u>Geftman</u> was -- we think <u>Geftman</u> is useful for

15   another purpose.  Geftman was a gift versus debt analysis in a

16   tax context.  And I think the lesson from <u>Geftman</u> is you're

17   not, or one is not, and a Court is specifically not

18   constricted by the categorization of a particular obligation

19   based on how it's booked by in <u>Geftman</u> the taxpayer, or here

20   the debtor.

21        Your Honor need not do what the IRS did in <u>Geftman</u>

22   and go through that 16 step test because we have the benefit

23   of having a confirmed plan that creates its own set of

24   obligations in accordance with the language contained within

25   its four corners, including the indenture.

Argument - Mr. Silverschotz                                    44

1            The fifth tranche doesn't, or I should say, didn't

2     get paid until the Berkadia loan was paid in full, and Mr.

3     Landers noted that I didn't reference, I think, page 41 and 42

4     of the disclosure statement.  And I will notice in turn that

5     he didn't reference page 37 of the disclosure statement where

6     the mechanism for payments is laid out.  And I won't go

7     through that, Judge, it's in our papers.

8            And I'm sure that Mr. Landers will agree with me

9     that disclosure statements are not operative documents.  They

10    may convey a sense of what the parties believe at a particular

11    time, but I can't recall seeing a plan or a set of plan papers

12    that didn't have something to the effect that the words of the

13    disclosure statement are superceded by the plan in the event

14    of any conflict between the two.

15           And I'm sure we can find misplaced commas in, or

16    colons that benefit either side and throw them back and forth

17    at each other.  But I think we have to focus, essentially, on

18    the key operative documents, which are the plan and the

19    indenture.

20           What is obviously missing in both the disclosure

21    statement, the indenture and the plan, is the word dividend,

22    appended to the 5 percent.  It's not there.  The debtor points

23    to the term restricted payment.  But restricted payment is

24    worded a little more broadly than the debtor would have Your

25    Honor find.  And I don't want to accuse Mr. Landers of

1    anything except perhaps, you know, a logical fallacy.  And I

2    think what he's arguing is the -- is a proposition that falls

3    to the fallacy of the excluded middle.

4            The distribution of the 5 percent is a restricted

5    payment but it's not a dividend.  Nor is it a payment in any

6    way that's contrary to the Delaware statute.  And we've had

7    that all in our papers, Judge, and I'm -- I don't want to use

8    up all the time.  I know you have a 4:00 hearing.

9            Ultimately we think the dividend debt issue is

10   interesting but it's really academic because the obligation is

11   one that's set forth in the plan.  The plan obligation is

12   express and the only party at the end of the day that would be

13   affected by it is the party that's already consented to it.

14           The debtor's sole reply repeats, more or less, the

15   arguments they made in their original papers.  It has six

16   sections and I can go through them very quickly and just touch

17   on them.

18           In the first section, they reiterate the contention

19   that the plan obligations don't create debt an page six of

20   their sur-reply, they bold the language that indicates that

21   the debtor is supposed to "make restricted payments unless" --

22   dot, dot, dot -- "the making of any such restricted payment

23   would be an impermissible restricted payment."

24           But they continue on but they don't bold the -- what

25   the important language because the paragraph continues and

1    says that if the restricted payment is impermissible, then

2    "the company shall retain such amounts and any such retained

3    amounts shall accumulate and shall be used to make restricted

4    payments at such time, or from time to time, when such

5    restricted payments are not impermissible."  Again, we're back

6    to the word "when" and Grossman makes very clear that --

7    that's a word of timing.

8         The other minor newish point I'd like to describe to

9    Your Honor is over the weekend, looking for the word "when" in

10   some New York law and I found it.  And this is 100 percent an

11   argument by analogy but I think it's -- it's useful.  There's

12   a surrogate's case called In Re O'Hanlon's Will, (phonetic)

13   it's from 1941 and it's cited at 27 NYS2d 889.  And I don't

14   think the case is going to rise or fall on this but it's an

15   interesting case.

16        And involved the will that said that a beneficiary

17   of the will would retain a benefit -- excuse me -- obtain a

18   benefit when they turned 23, I think the age was 23.  And

19   unfortunately, the beneficiary died before they got to age 23

20   and as wills often do, there was a residual beneficiary.  And

21   there were also heirs to the beneficiary who didn't make it to

22   23.  So the question was, who got that share, the heirs of the

23   beneficiary who didn't make it to 23 or the residual heirs who

24   would get the reversionary interest?

25        And since I'm citing it, Your Honor, you probably

Argument - Mr. Silverschotz

1    can probably guess that the heirs of the beneficiary who was

2    to receive the funds when he reached age 23 got the rights,

3    because the rights were vested in the will, not upon the

4    arrival at the age of 23.  It was as in <u>Grossman</u>; it's a

5    timing issue.  The use of the word "when" in New York is

6    interpreted as a question of timing.

7         The -- at page seven, the debtor attempts to foist

8    on us, whether it was really a (indiscernible) by contending

9    that we say that all obligations under a plan to equity are

10   debts.  Of course, we contend nothing of the sort.  Using the

11   debtor's example, a plan provision providing for a

12   distribution of preferred stock, certainly doesn't convert

13   that security into a debt instrument.  The instrument is what

14   it is.

15        But I think it's interesting, Judge, because if the

16   debtor failed to issue the security, failed to perform under

17   the plan, I think a different sort of claim would arise and

18   what's even more interesting is that the example that the

19   debtor gave is exactly what we don't have here.  We didn't get

20   preferred stock.  We didn't get put into the junior tranche.

21   We're in the fifth tranche of the waterfall of the indenture.

22   We are there ratable with the 95 percent that goes to the

23   senior note holders.

24        The debtor's second point focuses again on this

25   condition precedent issue and the debtor says the following:

1    "The plan language is not rendered ambiguous by the plan's

2    failure to state how the funds should be treated if the

3    conditions are never capable of satisfaction."  Au contraire.

4           We think that the word "unless" does only one thing

5    and it establishes the time for the funds being upstreamed;

6    they're either upstreamed for distribution or upstreamed for

7    segregation.  And the plan says shall, shall, shall when, with

8    respect to our funds.  The ambiguity in the plan, as the

9    debtor admits, is that the plan is silent on what happens when

10   "when" is never; if "when" is never.

11          And what the debtor really has put together and is

12   presenting to Your Honor for approval is -- is the idea that

13   when everyone north of the sixth tranche -- and that's the one

14   below us -- other than the senior note holders has been paid

15   in full, the senior note holders are entitled to pick our

16   pocket as if we had a subordination.

17          The plan doesn't say that expressly.  If it did, we

18   wouldn't be here.  And because of that, the motion has to be

19   denied.  And they say at page 13 that the debtors are not

20   contractors attempting to distinguish and we agree that the

21   debtor's not a contractor.  There it contends at page 14 that

22   our argument would render plan language superfluous.  We

23   disagree with that, obviously.

24          Their third point is that the distribution of the

25   segregated funds would be impermissible restricted and we

Argument - Mr. Silverschotz

 1    disagree because we believe those funds are paid when they're

 2    upstreamed.  And we believe that the senior note holders

 3    consented to the distribution out or segregation at the time

 4    they consented to the plan.  And even if we're wrong on that

 5    point, Judge, and I don't we are, the status of

 6    impermissibility really is only there to protect the interest

 7    of the senior tranches, not the parties that have consented to

 8    a distribution.

 9         The debtor's fourth point is back to forfeiture.

10    They set up what I think is a straw man when they say that

11    it's -- it's error that our argument is that any -- they say,

12    "any contractual condition to a payment effects a forfeiture."

13    And Mr. Landers said that when he was just standing here right

14    before.  If that's what we had said, then I would agree with

15    that we were wrong.  We do not believe that every failure of

16    the condition -- we don't contend that every failure of

17    condition creates a forfeiture.

18         We say there is not condition and to take our money

19    away would, in fact, cause a forfeiture.  If I had to put what

20    we're saying in one long and fairly complex sentence, I'd say

21    our argument is this:  We say it is impermissible where a

22    document is silent and thus ambiguous, to judicially impose

23    against a non-drafter and non-proponent, a condition precedent

24    that was not clearly expressed in the documents and the

25    consequence of which is the forfeiture of material

1    consideration expected by that non-drafter, non-proponent, or

2    the subordination of those rights in violation of the rule of

3    explicitness respecting subordination.

4         As we mentioned before, New York courts interpreting

5    New York contract law are so loathe to impose a condition

6    precedent by implication, they won't even do it against the

7    drafter of a document.  And at page 16 and 17 of their --

8    their final set of papers, the Judge asks the Court

9    essentially, pay no attention to the admission of ambiguity

10   that they made in page 6 of their opposition to Linden

11   reappoint the committee motion.

12        You know, so now, and we heard it during argument,

13   everything is crystal clear.  And I think Mr. Landers may have

14   actually used the phrase "crystal clear"; if he didn't, I

15   apologize.  Reading this part of the debtor's sur-reply,

16   Judge, given all the protestations by the debtor as to how

17   clear the operative documents supposedly are, one would think

18   that it was the Committee that filed the clarification motion

19   and not the debtor.

20        The debtor's fifth argument is to challenge the idea

21   that silence can produce ambiguity.  We agree that if a

22   document is utterly clear and if no possible result would

23   exist, other than the result being proposed, a side issue

24   inconsequential silence, isn't by itself going to create

25   ambiguity.  We don't -- we don't think that that is our set of

1  facts.

2          We think at page 19 of their final brief, they

3  ultimately paints itself into a corner, where it contends at

4  long last that "because there's no ambiguity, there's nothing

5  for this Court to construe against the reorganized debtor."

6  And I have to ask, then why are we here?  We're not the ones

7  making the motion.  And we believe that the idea that there's

8  no ambiguity in these documents is an unrealistic assertion.

9          The last argument Mr. Landers made -- and to his

10 credit it was a throwaway argument and I think he more or less

11 threw it away during his presentation -- was the idea that the

12 funds are undeliverable and hence they fall into the lawyer-

13 plagued undeliverability clause that's in every plan where

14 somebody has moved and hasn't provided forwarding information

15 or otherwise shown up.  And administratively, to clean up the

16 case, we either pay the money into the registry or have it go

17 to the reorganized debtor.  We agree that -- with the implicit

18 suggestion that that's not really an applicable clause.

19          Finally, the final argument is the issue of -- of

20 constructive trust status.  I don't want to spend a lot of

21 time on it, Judge.  I think that under New York law, the key

22 issue here is unjust enrichment and the imposition of

23 constructive trust in this context is more an issue of remedy

24 rather than the existence per se of a trust in the current

25 status of things.  We think that a constructive trust may be

1    imposed over the funds to ensure that they are reserved for

2    the parties who are entitled to those funds.  We think that

3    party are the equity creditors, whose rights are parried with

4    the 95 percent interest in the fifth tranche of the indenture.

5         Silence in the indenture on this point can only

6    devolve to the benefit of the equity shareholders and not to

7    the senior note holders.  With respect to silence, Your Honor,

8    I'd like to close with an observation made by Thomas Hardy,

9    "that a man's silence is wonderful to listen to."  And with

10    that, I'll sit down.  Thank you.

11         THE COURT:  Okay.  I don't need anymore.  I've had

12    enough.

13         I've spent a lot of time with the relevant

14    documents.  I don't think they're ambiguous and I think the

15    debtor has it right.

16         The multitudinous arguments offered by the

17    Committee, for the most part, are either irrelevant or off the

18    wall.  The concept of forfeiture, subordination, constructive

19    trust, sharing pari passu is all in gross conflict with the

20    terms of the plan and the disclosure statement.  And I want to

21    go through the disclosure statement and the plan and the

22    indenture to -- to make clear why I agree with the debtor on

23    this issue.  I don't think -- the documents are verbose and a

24    bit complex, but I think they are clear on this point.

25         I first looked at the disclosure statement and the

Ruling - The Court

1   summary description of the classes and the treatment of those

2   classes.  And in my copy of the disclosure statement, I'm

3   looking at page 14, which contains a portion of the table

4   describing the classes and the treatment, and the FNV Group 6

5   interest as a relevant class for the Equity Committee.

6         And there it says, "On and after the distribution

7   date, the legal, equitable and contractual rights of holders

8   of allowed interest in class FNV Group 6 (interest), shall

9   remain in effect" -- let me just pause.  What it says there,

10  the interest remain interest -- i.e., the interest is a stock

11  interest.  Then it says, "subject to, number one, additional

12  group common stock to Berkadia and the issuance of additional

13  preferred stock."  And romanette (iii) it says, "the other

14  terms and conditions of the plan."

15        Now, if we then look at the plan on page 21 of my

16  copy where it defines the -- where it describes the class FNV

17  Group 6 (interest), like the summary says, "On and after the

18  distribution date, the legal, equitable and contractual rights

19  of holders of allowed interest in class FNV Group 6 shall

20  remain in effect subject to the effect of, one" -- and then it

21  makes reference to the additional common stock to be issued --

22  "two, the issuance of preferred stock", and romanette (iii),

23  the other terms and conditions of the plan as more fully --

24  more fully described in sections 6.2, 6.3, et cetera.

25        I then turn to the plan section 6.2, which is

Ruling - The Court

1   obviously a description of the senior notes.  And that

2   description refers us to the interim exhibit 6.2(C)(1) and the

3   interim exhibit 6.2(C)(1) -- which is the term sheet -- then

4   describes in detail the, number one, the cash distribution,

5   the waterfall and then it says as a caption -- and there's no

6   pagination for this -- limitation on restricted payments.

7        I quote:  "FNV Group will not directly or indirectly

8   make any restricted payments other than the restricted

9   payments under the 'use of cash' covenant described above."

10  In my view, that is a very plain statement that unless the

11  restricted payments can be made, which are not impermissible

12  restricted payments, then no payments will be made.  The

13  indenture, as I will point out later, makes that point

14  equally, if not equally clear, when I get to it.

15        What is also interesting about this particular

16  provision is in defining the restricted payment, it defines it

17  as a declaration or payment of any dividend or the making of

18  any distribution.  The debtor's position doesn't turn on

19  labeling these as dividends.  It's a distribution with respect

20  to the equity position.

21        It goes on to say, "provided however, the restricted

22  payments shall not include" -- and it then lists five items.

23  It does not include the elimination of fractional shares.  It

24  does not include payments in cash in lieu of fractional

25  shares.  It does not include payments to dissenting

1   shareholders, and most importantly, it does not include

2   repurchases, redemptions, acquisitions or retirements to

3   employees, directors or officers.

4        Then it goes on to say, "provided that the aggregate

5   of all payments in clauses 1, 2, 4, and 5 shall not exceed $5

6   million dollars per calender year."  My interpretation of --

7   well, let me get -- let me go now to the indenture.

8        The indenture, of course, in section -- we've

9   focused on section 4.06, which is the waterfall distribution.

10  But equally important is my view, is 4.07 and that says, and I

11  quote, "The company shall not and shall not permit any of its

12  subsidiaries to directly or indirectly make any restricted

13  payments except such restricted payments that are permitted or

14  required by section 4.06" -- and that's the waterfall -- or

15  section 4.07(B) hereof."  4.07(B) hereof, is the, what was

16  also referred to in the plan as to the five exceptions to the

17  payment of restricted payments, including redemption of shares

18  of directors and employees provided that that will not exceed

19  $5 million dollars in any calender year.

20       Now, I now want to get back to the disclosure

21  statement and elaborate a little further on the point that Mr.

22  Landers made at the outset.  In my -- I'm looking in my copy

23  of the disclosure statement, docket number 533 on page 48.

24  It's a -- it's a discussion captioned "Special risk for equity

25  holders".  Sub part (a) talks about the dilution resulting

1   from the distribution of, to Berkadia, of half of the equity

2   position.

3         The next caption on the top of page 49 is labeled

4   "Dividends".  The second -- third sentence of that paragraph

5   says -- and this is a lengthy reading but I think it's

6   important -- "Subject to applicable corporate law (which

7   limits the circumstances which corporations may legally make

8   distributions to shareholders), limited distributions to

9   shareholders will be permitted as the new senior notes are

10  paid off as described in the next paragraph."

11        I want to then skip to the third -- the fourth

12  sentence of the next paragraph, and it says, "If FNV Group

13  does not have sufficient funds ultimately to repay the new

14  senior notes in full (together with accrued interest therein),

15  it is likely that only limited distributions will be made to

16  shareholders."  Let me pause for a moment and observe that I

17  think that sentence of limited distribution refers to the five

18  exceptions in exhibit 6.2(C)(1) of the plan.  In other words,

19  the $5 million limitation distribution.

20        The next sentence, "There can be no assurance that

21  FNV Group will make any distributions to its equity holders,

22  even if all the contractual prohibitions thereto have been

23  exercised."  That says to me, you are shareholders.  You may

24  or may not get a distribution and if applicable law precludes

25  a distribution or a dividend being made, you get nothing.

Argument - Mr. Silverschotz

1          It goes on to say, "Subject to meeting the legal

2     requirements permitting distributions to shareholders,

3     applicable law and Delaware law, and so long as the making of

4     any such distribution would not render FNV group insolvent" --

5     the issue we have here -- "FNV Group currently intends to make

6     distributions permitted under the terms of the new senior

7     notes as soon as possible."

8          That provision, together with 4.7 of the indenture,

9     in my view shouts at us when it says there are circumstances,

10    plain and simple, which would preclude any payment to any of

11    the shareholders.

12         And now the only question is will these events never

13    go away?  And you've ducked that issue.  Should we just wait

14    until the debtor is finally wound down and you still get

15    nothing?  Or do you want to debate whether those conditions

16    can ever be satisfied?

17         MR. SILVERSCHOTZ:  Your Honor, if the question is do

18    we want to have a lengthy and expensive investigation on

19    whether or -- there are all sorts of issue -- whether you

20    address what we've done, what we haven't done.

21         When last we were here, Your Honor made quite clear

22    that we had a limited budget.  Your Honor felt we could spend

23    about $20,000 -- and I think that was the number that was

24    expressed on the record -- to do a, I don't want to use the

25    phrase drive-by, but a low intensity evaluation of the

1    debtor's assets.  What the Committee did was, after much

2    searching, we found what we thought was an ideal person to

3    review the aircraft assets which are by far, and counsel will

4    correct me if I'm wrong, the largest group of assets of this

5    debtor.

6              THE COURT:  Are these actually aircraft or are

7    they --

8              MR. SILVERSCHOTZ:  They're aircraft --

9              THE COURT:  -- claims against aircraft?

10             MR. SILVERSCHOTZ:  I believe, well, it's probably a

11   combination of -- of every conceivable asset that one can have

12   associated with aircraft.  We'll call them the aircraft

13   related assets, including ownership of -- of planes themselves

14   that are out on lease and there's an income stream.

15             This gentleman had a good, preexisting working

16   knowledge of the Finova fleet.  And working with -- after we

17   entered into a confidentiality agreement, he prepared a

18   report, which we have not shared with the debtor.  His review

19   was -- the results of his review were that he believed that

20   the actual value of the planes was at the very high end of the

21   range that the debtor had given, but it was certainly not a

22   multiple of the values, of the range of values that the debtor

23   gave.

24             So, that's -- that's one thing that we know.

25   Whether we would automatically extrapolate from that, that

1    point, an overall evaluation -- to do an overall evaluation,

2    Judge, I mean, you do that practically every day of the week

3    sitting where you are.  And we all know --

4              THE COURT:  I don't do it.  I hear others do it.

5              MR. SILVERSCHOTZ:  Well, yes.  But Your Honor sits

6    in judgement of what the work that other people -- the work

7    that other people have done.  And it is expensive, it is time-

8    consuming and we think it would have been an error for us to

9    go off and -- and hire, you know, Shannon or Price Waterhouse

10   or one of the other bankruptcy evaluation gurus.  And we

11   haven't done an evaluation of what the debtor's net operating

12   loss is worth in the marketplace.

13             We don't know if the debtor has the ability to use

14   some of that cash and buy back notes and produce value.  We

15   don't know if the debtor had litigation claims.  We don't know

16   if the Berkadia -- excuse me -- the Berkshire Hathaway

17   assertion of force majeure was valid or not.

18             There are all sorts of issue that in theory could --

19             THE COURT:  But that's -- that's an event that took

20   place four years ago, isn't it?

21             MR. SILVERSCHOTZ:  Your Honor, if it's a six year

22   statute on breach of contract, you know, I don't know even as

23   the point Your Honor makes is whether or not that means it's

24   beyond the statute of limitations or not.

25             I can't stand here today, Your Honor, and say -- and

1   throw up my hands and say, sure, they're insolvent today and

2   they're going to be insolvent for all time.  Our view, Judge,

3   is that on the effective date, they had $600 million in

4   shareholders equity and they entered into a contract to pay us

5   5 percent and made it a contract.

6           And I know Your Honor said our arguments were off

7   the wall.  I prefer to think of them as creative and

8   thoughtful.

9           THE COURT:  Maybe some of them were creative.

10          MR. SILVERSCHOTZ:  Thank you, Your Honor.

11          But, we're working here with the -- the facts, the

12  time, the budget and the documents that we have.  If we --

13          THE COURT:  Let me hear from the -- tell me about

14  the wind-up of this corporation.  What is the timetable?

15          MR. LANDERS:  Your Honor, we were specifically

16  talking about that about three hours ago.  And Finova has at

17  least, and I'm a little hesitant to say very much because

18  Finova still isn't public, isn't a public company and some of

19  these things are not public.

20          But as of now, Finova is proceeding to liquidate its

21  assets internally.  Whether at some point there'll be a change

22  in direction is not clear.  Finova has made some efforts to

23  sell assets in bulk to purchasers like a GECC, or somebody

24  like that.  And in general they found that -- that the

25  benefits to everybody -- new senior note holders in Equity --

1    would be served by continuing the litigation, having

2    considering -- continuing the internal liquidation itself

3    rather than a sale in bulk.

4            I'd say only two other things --

5            THE COURT:  What are the bulk of the assets?  Are

6    they the airplanes?

7            MR. LANDERS:  They are largely aircraft.  In some

8    cases, they're on lease and some cases they're not on lease.

9    Again, if the Court wants to inquire further, Mr. Ross is here

10   and he can -- he's really on this --

11           THE COURT:  I'm just trying to find out, is it next

12   year, two years from now, five years from now?

13           MR. LANDERS:  Well, some of them come off lease

14   periodically but I will say that in the last -- in the last

15   quarter, the company did, unfortunately because of the

16   Northwest bankruptcy, have a further write-down of its -- of

17   its Northwest lease, of its various lease portfolios.

18           I think if Mr. Ross and the Court is free, I would

19   be glad to have Mr. Ross address the Court and answer these

20   questions.  But in essence, the planes tend to be older

21   planes.  Some of them are on lease, some of them not.

22   Northwest, as you might expect, is making noises about trying

23   to --

24           THE COURT:  Here's -- let me tell you what I'm

25   getting at.  Should we give the Committee more money to do

Argument - Mr. Landers

1    evaluation --

2            MR. LANDERS:  Well, Your Honor --

3            THE COURT:  -- or should we sit back and wait until

4    the wind-down is completed?

5            MR. LANDERS:  Well, Your Honor, I don't think that

6    that's -- I don't' think that's fair to anybody and I'll tell

7    you why.  We have made -- if you look at our 10-Qs, our 10-Qs

8    gives intimate detail about the liquidation.  Our 10-Qs, for

9    about four years, have specifically said that we're not likely

10   to have enough assets to repay the new senior notes.

11           It sets forth that information in great detail.

12   That information is reviewed on a quarterly basis and updated.

13   And the situation is that we still have a deficiency of well

14   over $1 billion, with an asset pool of -- I mean, when you

15   look at the assets, you've got to look at them as in different

16   categories.  A portion of the assets are cash, which doesn't

17   appreciate in value.  A portion of the assets are simply

18   receivables from customers that were financed by Finova.  They

19   can't get above the face amount of the paper.

20           Theoretically, the airplanes could decrease but --

21   but the fact of the matter is that the disclosure -- that the

22   10-Qs set out in great detail the present value of the

23   aircraft and gives figures for the values of the various

24   portfolios, and they're very substantially under water.  They

25   did have a consultant who familiar with the portfolio who

1    looked at these things and one can only assume that he didn't

2    find any basis to think that the assets would be worth

3    anything like the multiple that would be required.  And we're

4    not talking about 10 or 15 percent difference.  We're talking

5    about a 300 percent increase in value of basically used

6    aircraft.

7            I mean, I think the odds of that happening are very,

8    very remote and I think that's why the Equity Committee chose

9    not to pursue it.  But that information is all a matter of

10   public record and shareholders have access to that information

11   for four years, and as I said --

12           THE COURT:  That doesn't mean the Committee's not

13   entitled to challenge it.

14           MR. LANDERS:  No, it doesn't mean that, Your Honor,

15   but -- but you have to come -- you have to get to a point

16   where a challenge is frivolous, Your Honor.  I mean, you have

17   to just get to that point where -- where it's so out of line,

18   it's so unlikely that there's no -- that there's no basis for

19   it.  I mean, we have -- well, we have -- okay.

20           THE COURT:  Well, look, but now that I've turned

21   away their -- their legal argument, we have the issue of

22   whether your client is forever insolvent.  And until they say

23   they agree with that, then I say somebody's got to prove it to

24   me.

25           MR. LANDERS:  Well, Your Honor, we -- we have Mr.

Argument - Mr. Landers

1   Ross here.  We didn't -- we didn't prepare to put him on but

2   I'm prepared to have him testify today --

3          THE COURT:  I'm sure the Committee's not prepared to

4   examine him.

5          MR. LANDERS:  No, I know they're not prepared but

6   they were on notice that he was coming and that the reason he

7   was coming was specifically to address these questions if

8   raised by the Court.  And I'd be more than glad to just ask

9   him to come up and tell the Court what the situation is and

10  let the Court determine on the basis of somebody who has the

11  information whether --

12         THE COURT:  Can he tell me how -- when the end of

13  the wind-down will be?

14         MR. LANDERS:  Yes.  It will be no later than 2009.

15         THE COURT:  2009 --

16         MR. LANDERS:  Nine, yes.  And probably before that

17  but that would be the latest possible.

18         MR. SILVERSCHOTZ:  Your Honor, all that suggests to

19  me is that the motion although the debtor may be entitled

20  relief, today it's not emergent.

21         THE COURT:  So, what do you want, to wait until

22  2009?

23         MR. SILVERSCHOTZ:  Well, I'd like to wait forever,

24  Your Honor, but if made until 2009, it certainly, at least as

25  Your Honor reads the documents, if we don't get the money, the

Argument - Mr. Landers

1    money we think has to be reserved under the documents as

2    they're written, at the very least.

3           MR. LANDERS:  Your Honor, there's simply no purpose

4    in spending more money to do -- to do this.  We have conducted

5    the liquidation -- again I defer to Mr. Ross -- but of the

6    assets we started with in 2001 when the plan was confirmed,

7    probably something like 80 to 90 percent of them have been

8    liquidated.

9           THE COURT:  The portfolio of -- of obligations; I

10   don't imagine there's much debate about that.  If they're

11   being paid currently, then presumably they're worth face

12   value.  But most of them, if they're not being current, then

13   look, bankers -- bankers make these judgments every day,

14   whether a claim is collectible and to what extent it's

15   collectible.  You're client has done it.

16          MR. LANDERS:  Yes, Your Honor.  We have done it --

17          THE COURT:  Shouldn't they be able to do that?

18          MR. LANDERS:  Your Honor, they can do it and they

19   don't really even have to do it because it's set forth in the

20   -- in the 10-Q that we filed.  There are judgments made about

21   what the portfolio is and there are reserves taken which are

22   updated on a quarterly basis, based on collections and

23   developments and the like.

24          And there are numbers behind that, which is our

25   matter of public record.  Now, I mean, theoretically they can

1   look at it, but at the end of the day as you say, people would

2   have to make evaluations of what the worth.  But they can't be

3   worth more than the face value of the paper.  Virtually all of

4   them are in default.

5        The "good" obligations have been collected, were

6   collected a long time ago.  So we're dealing with defaulted

7   obligations and I think this Court, for example, is familiar

8   with one of the larger ones in the portfolio and that may be

9   on a larger scale, typical of what's left in the portfolio.

10       THE COURT:  That would may be resolved after 2009.

11       MR. LANDERS:  Your Honor, if it's ever resolved.

12       THE COURT:  I'm not talking about this level.  I'm

13   talking about the appellate level.

14       MR. LANDERS:  Oh, appellate level.

15       THE COURT:  It'll be resolved at this level long

16   before that.

17       MR. LANDERS:  But the bottom line, that's what's

18   there, is obligations such as that.  I think that may be the

19   biggest one in the -- in the portfolio.  Even if you valued

20   you at the face, which -- you're still not even -- I mean,

21   there's a deficiency of, I've said about a billion two, a

22   billion three in dollars.  You just can't take, let's say,

23   $500 million or $400 million of paper, aircraft leases and

24   aircraft and say that's going to appreciate to -- appreciate

25   and cover a gap of $1.2 billion.  It's just not realistic.

1          Now, I mean, the other point I'd make is that the

2    situation has continued through periods.  In other words, if

3    you look at Finova's statements over the last four years,

4    you'll see that this deficit, in effect, has existed for a

5    long time.  And it hasn't come down in --

6               THE COURT:  I understand everything --

7               MR. LANDERS:  Okay --

8               THE COURT:  -- you're saying.

9               MR. LANDERS:  Okay.

10              THE COURT:  But the Committee doesn't sign off on

11   it.

12              MR. LANDERS:  Well, Your Honor, I think that the

13   question ultimately is  --

14              THE COURT:  -- Then --

15              MR. LANDERS:   -- whether the company should pay for

16   it --

17              THE COURT:  -- Don't we have to have a hearing on

18   that?

19              MR. LANDERS:  Well, I don't think so, Your Honor.

20   We had -- we had a declaration from Mr. Ross, which described

21   the situation and Mr. Ross is here to testify to that if the

22   Court wants to hear it, and he'll be glad to testify.

23              THE COURT:  No, they took a position that made that

24   issue go away.

25              MR. LANDERS:  Well, but --

Argument - Mr. Landers

1          THE COURT:  But now it's back in front of us.

2          MR. LANDERS:  But, Your Honor, they made it go away

3    because they knew that deep down that there was no basis for

4    that position given where -- where things were.  I mean, if

5    again, I think it's a question it's fair to tax the creditors

6    for the costs of doing this and what purpose it served.  In

7    another words, this is not a case where they have a raised a

8    doubt, for example, or whether there's some question or

9    something like that.

10          This is a question where the evidence is here.  It's

11    in court today.  We're prepared to put it -- put it on and the

12    question is whether they've had a preliminary expert look at

13    it.  It's obvious that he was not able to suggest anything

14    that would indicate a major variance in what we're saying.

15    The question is whether they ought to be allowed to do -- I

16    mean, it sort of like, slaying a dragon.  You just can't --

17    you just can't prove a negative like this any other way than

18    to say these are the value, these are the assets and

19    reasonable people have to make judgments as the Court said.

20          I mean, people do this kind of valuations all the

21    time.  And the people who are doing it at Finova are

22    experienced.  They've been doing it for four years.  We have

23    accountants verifying this.  We're an audited company.  I

24    mean, at some point you have to say these people know what

25    they're talking about.

1          So I would urge the Court not to impose this expense

2    on the company.  If they want to do it at the expense of

3    Equity, well, maybe that's okay.  But I don't think this

4    expense should be imposed on the company to do this at this

5    point.  And I can't say it any more strongly, Your Honor.

6          THE COURT:  Well, my view is that they have a bona

7    fide belief that they're in the money.  They should be given

8    an opportunity to prove that.

9          MR. LANDERS:  But they haven't said that, Your

10   Honor.  Mr. Silverschotz has been very careful and I respect

11   him for being careful.  He hasn't -- I mean, a lawyer can

12   always go before the Court and say, well, Your Honor, if you

13   look around you never can tell what we'll find.  And that's

14   probably -- probably true, but you have to deal with

15   probabilities and reasonable expectations and those kinds of

16   things.

17          And you have to basically ask a question whether a

18   whole bunch of people who know enough -- a lot about this

19   asset -- are not only wrong, but wrong by such a wide margin

20   that -- that they ought to be allowed to investigate.  I mean,

21   I think that's the issue.  I mean, to allow them to

22   investigate, you have to say that the company's internal

23   accounting people -- again, Mr. Ross is here -- and their

24   outside accounting just don't know what they're talking about

25   by a wide margin.  At least, I would hope that the Court would

1    not permit them to look on that basis.

2            And again, Mr. Silverschotz has not said anything to

3    suggest any infirmity in the presentation that we've offered

4    on these points.  But again, I'd urge the Court to listen to

5    Mr. Ross and make its own -- make its own conclusions on this.

6            THE COURT:  Well, I don't think today is the

7    appropriate time to do that.  I'm sure that the Committee is

8    not prepared to cross-examine him.

9            MR. LANDERS:  I would agree with that, Your Honor;

10   they're not.  There's nothing else I can say, Your Honor.

11   Thank you.

12           THE COURT:  Do you want to pursue a challenge to the

13   valuation that the debtor has submitted to show that they are

14   insolvent and will forever remain so?

15           MR. SILVERSCHOTZ:  Your Honor, I think the first

16   thing that I'd like to be able to think about challenging with

17   deference in every direction to Your Honor and the reasons you

18   gave for your ruling, the first thing I'd like to consider is

19   the appellate rights of the Committee on the legal issues.

20           We think they are interesting.  We think there's

21   enough to fight about and we think that looking at the

22   various, you know,  toggles of issues as we go through this

23   matter, it may be less expensive to simply pursue the legal

24   issues on an appellate level than engage in a valuation

25   contest and ultimately it becomes a question of cost.

1          Mr. Landers is right.  I don't have the top ten

2     reasons why I think the debtor is solvent today.  And it is

3     quite possible that even after spending a lot of money, I

4     still won't have those top ten reasons.  But I don't know that

5     one or way another as I stand here today.  Nor could I even

6     give Your Honor an idea of how much such an undertaking would

7     cost.  I frankly have no idea at all.  Nor do I know how long

8     it would take, even with parties working as at optimal

9     efficiency and speed.

10          But I think that taking Your Honor -- I don't know

11    if Your Honor intends to simply so order the transcript or

12    write an opinion on this one, but however we go up, I don't

13    know if I'm glad or not to hear that the process is going to

14    take another 2, 3, 4 years before it wraps up.  We have plenty

15    of time to go all the way up as far as it's going to go.  And

16    I think between the two -- the two sides, we've identified

17    every conceivable legal issue that might, that has to be

18    briefed for consideration.

19          So, it may make more sense to hold that fact issue

20    in abeyance.  It's better to hold the cash as well while we

21    pursue our remedies before the District Court or the Court of

22    Appeals and at the end of the day, see where we are.  It may

23    very well be that at that time, the Committee's view or the

24    debtor's view is different than it is now as to the need to

25    pursue the fact that -- presumably more expensive fact

1    determination.

2         And who knows?  Maybe the matter will resolve itself

3    in another matter -- another matter.  But I think that's -- as

4    a lawyer standing here now, that's the process that I'm

5    thinking about most.

6         THE COURT:  Okay.  Well, look, I think we need to

7    then address an order.  And my view is that to simply recite

8    that for the reasons that I gave in open court -- refer to the

9    transcript -- I would grant the debtor's motion to the extent

10   that the debtor is presently and will be forever insolvent.

11   But leaving open the issue of whether the debtor is presently

12   or forever insolvent.

13        That way, you can pursue your appeal on the legal

14   issue and if you want to pursue the question of whether there

15   is presently and forever will be an insolvency, we can do that

16   also.

17        MR. SILVERSCHOTZ:  Your Honor, what I would do is

18   consult with my -- I am just the lawyer, and I will consult

19   with my client.

20        We have the -- the interim budget issue.  There's

21   the -- the third matter on the agenda was our firm's motion to

22   increase the cap to 200 and I wish had left that first number

23   blank so I could fill it in, based on the results here today.

24   But on the -- on the calender is that motion.  I believe the

25   debtor wanted to meet us halfway but I think we're easily

1    going to exceed even the -- over the next month or so, or

2    maybe even this month, we've still two days left -- 200,000.

3         I am -- I am very leery of, and although I

4    appreciate very much Your Honor's invitation to pursue the

5    fact issue, we were very careful in our first step.  And I

6    expect us to continue to be very careful in how we pursue the

7    issue because I do not want to treat the debtor's assets like

8    a smorgasbord for professionals.

9         And I know that I want to spend the right amount of

10   money and we -- I think we're appropriately aggressive in

11   terms of pursuing legal issues and I think we'll be equally so

12   on the appeal.  I don't want to be excessively aggressive on

13   the fact issue because those numbers can -- can mount up.  I

14   think our collective experience is that the process of doing

15   this kind of valuation analysis can become very expensive very

16   quickly.

17        So, I'm going to consult with my clients with

18   respect to how they wish to proceed.  But in fairness to Your

19   Honor and fairness to the debtor, the last thing I want to do

20   is, in response to Your Honor, say, you know, yippee, you

21   know, off to the races we go.  Because I think that would be

22   inappropriate and I want to do one thing at a time.  And I

23   think right now, our principal focus should be on the -- on

24   the appellate review of Your Honor's decision, with deference

25   in every direction to Your Honor's decision.

Argument - Mr. Landers

1    MR. LANDERS:  Your Honor, just -- just one thing.

2    Notwithstanding the Court's direction in the order --

3    obviously we will draft it that way -- but I would like the

4    opportunity, if Mr. Silverschotz consents, to submit an order

5    which resolves the financial issues, which I think at the end

6    of the day I'd like to try to convince him.  Because I don't

7    think if you don't do that, that he's going to have a final

8    order for PLR.  I think he's going to have to fuss with that

9    issue on appeal.

10    And I'm not sure, given the relative risks of on the

11    question of insolvency and financial condition versus getting

12    bounced up and down a couple of times, I'd like to try to

13    persuade him that he really doesn't want -- want that kind of

14    order; if the Court would find that acceptable.

15    THE COURT:  Yes, look, these have been SEC filings,

16    representations made under oath.  My guess is that you're

17    probably right, but I just can't deny them  your right --

18    MR. LANDERS:  No, I understand, Your Honor --

19    THE COURT:  -- their right to challenge you.

20    MR. LANDERS:  But all I'm saying is if I was in his

21    position, I would -- I would want a clean, final order to take

22    up to the Appellate Court rather than the uncertainty of when

23    an order like this sort of, is final and it's not final, which

24    I have to say, Your Honor, is an issue that I think the

25    court's have not reached broad consensus on when that occurs.

1  In any case --

2          THE COURT:  Look, I think at the end of the day,

3  what they'll do -- and this is pure speculation -- what I

4  would do is concede on the insolvency, get more money and to

5  take the appeal.

6          MR. LANDERS:  That's -- that's I think what I would

7  do, too, Your Honor, but for the present -- for the present,

8  we still are sticking with our offer of $150,000.  We continue

9  to believe that this is just taking money from creditors, that

10  that is inappropriate and that there's insufficient interest

11  of the equity side to finance these costs, as they've

12  demonstrated consistently throughout this -- this process, to

13  justify putting the burden on them to finance it rather than

14  the creditors or the debtor.

15          THE COURT:  How much have you spent to date?

16          MR. SILVERSCHOTZ:  Your Honor, our bill through

17  September that gave to Mr. Landers was 115 -- that's just

18  Anderson Kill.  I subsequently got my October bill, which is

19  another 50.  I do not have my November bill.

20          The -- I'm pleased to say that Mr. Sullivan's bill

21  is very small.  I think it's less than $5,000.

22          THE COURT:  Okay, what's the total to date?

23          MR. SILVERSCHOTZ:  The total, excluding November,

24  which again, I don't have, we are at 135 including our expert.

25  Just shy of 140 with our -- with Mr. Sullivan.  And if we add

1    the 50 that came in afterwards from October from Anderson

2    Kill, that's 190.  I asked for the cap to be increased to 200

3    but I suppose -- I'm sorry.  Did I -- 190 -- I asked for the

4    account to be increased to 200 but I know I'm going to ask for

5    more in the future if we're going to take an appeal.  Because

6    that obviously doesn't include the month of November and it

7    doesn't include anything for -- for appellate purposes.

8              THE COURT:  Okay.  Well, I'm going to authorize --

9    I'm going to increase it to 200 and you can file your notice

10   of appeal after the order is entered.  And if you want further

11   financing, you're going to have to come back and apply for it.

12             MR. SILVERSCHOTZ:  I will do that, Your Honor.

13             THE COURT:  And given my view of the merits of your

14   case, it will be an interesting discussion.

15             MR. SILVERSCHOTZ:  Message received, Your Honor.

16             THE COURT:  Okay.  We stand in recess.

17             (Proceedings concluded at 4:31 p.m.)

18                             * * *

19

20

21

22

23

24

25

1                          **C E R T I F I C A T I O N**

2

3         I, Susan A. Geddes, court approved transcriber, certify

4    that the foregoing is a correct transcript from the official

5    electronic sound recording of the proceedings in the above-

6    entitled matter.

7    Susan

8    Geddes

Digitally signed by
Susan Geddes
DN: CN = Susan
Geddes, C = US
Date: 2005.12.09
14:51:34 -05'00'

9    _____        December 8, 2005

10   SUSAN A. GEDDES

11   DIANA DOMAN TRANSCRIBING

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**EXHIBIT "C"**

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

JUDGE PETER J. WALSH

824 MARKET STREET
WILMINGTON, DE 19801
(302) 252-2925

December 2, 2005

Mark D. Collins
Daniel J. DeFranceschi
Deborah E. Spivack
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899

William D. Sullivan
Jami B. Nimeroff
Buchanan Ingersoll
The Nemours Building
1007 N. Orange Street
Suite 1110
Wilmington, DE 19801

Jonathan M. Landers
Janet M. Weiss
M. Natasha Labovitz
Thayer H. Thompson
Gibson, Dunn & Crutcher LLP
200 Park Avenue
New York, NY 10166-0193

Mark D. Silverschotz
James M. Andriola
Anderson Kill & Olick, P.C.
1251 Avenue of the Americas
New York, NY 10020-1182

Counsel for the Equity
Committee

Counsel for Reorganized Debtor

**Re:  Finova Capital Corporation
      Case No. 01-0698**

Dear Counsel:

This is a follow-up to my ruling with respect to the Reorganized Debtor's motion for an order clarifying the confirmed plan (Doc. # 22).

Although at the conclusion of the November 29, 2005 hearing I stated my views with respect to the Equity Committee's position on the matter, I did not have time to specifically comment on a particularly misleading point made by the Committee in its

response (Doc. # 62).   In paragraph 34 of the response, the Committee asserts that the disclosure statement supports its position that equity is owed a debt.   (Doc. # 62, p.17).   To come to this conclusion, the Committee relies on the phrase "common stock" being mentioned under Section VII.D.3.'s heading entitled "Potential Limitations on or Inability to Repay Debt or Make Contingent Payments."   (Doc. # 62, p.17).   I agree with the Reorganized Debtor that section headings are used for convenience of reference and will ordinarily not modify or restrict the unambiguous terms of an agreement. (Doc. # 65, p.9).

However, I think that the Committee's reliance on this heading is misplaced for another more important reason: the provision simply was not intended to address the treatment of equity interests.[1]   Rather, the provision deals with the payments on the New Senior Notes and the Contingent Interest on those Notes. Under the waterfall structure of payments, Contingent Interest is not paid until after specified appropriate equity payments.   Thus, to address Contingent Interest, one must at least mention those common stock distributions first as it has a higher priority.

The  way  the  Committee  presents  the  provision  is misleading.  In a parenthetical, the Committee quotes the provision

---

[1] Equity interests are addressed in subsection thirteen, which states, in part, "[t]here can be no assurance that FNV Group will make any distributions to its equityholders . . . ."   (Disclosure Statement, Section VII.D.13. (b)).

3

as stating: "FNV Group's ability to pay the principal of, and interest on the New Senior Notes, **to make distributions to holders of FNV Group common stock . . . is dependent on the generation of cash flow . . . ."** (Doc. # 62, p.17)(bold in original). However, that clause reads in full as: "FNV Group's ability to pay the principal of, and interest on, the New Senior Notes, to make distributions to holders of FNV Group common stock or New Group Preferred Stock and to make payments of Contingent Interest (as defined in the term sheet for the New Senior Notes) is dependent on the generation of cash flow by its subsidiaries and the ability of the subsidiaries to make cash available to FNV Group, by dividend or otherwise."

The Committee omits the phrase discussing Contingent Interest, which is the main point. Thus, by use of an ellipsis and some bold font, the Committee has shifted the focus of the clause from Contingent Interest to common stock. In short, one cannot explain the waterfall entitlement of the Noteholders to the Contingent Interest without noting the preceding Restricted Payments to the shareholders.

Very truly yours,

Peter J. Walsh

PJW:ipm

**EXHIBIT "D"**

# ANDERSON KILL & OLICK, P.C.

Attorneys and Counsellors at Law

1251 AVENUE OF THE AMERICAS ■ NEW YORK, NY 10020-1182
TELEPHONE: 212-278-1000 ■ FAX: 212-278-1733
www.andersonkill.com

**RECEIVED**

DEC 20 2005

**JUDGE WALSH**

Mark D. Silverschotz, Esq.
msilverschotz@andersonkill.com
(212) 278-1870

December 19, 2005

The Honorable Peter J. Walsh
United States Bankruptcy Judge
United States Bankruptcy Court
District of Delaware
824 Market Street, 6th Floor
Wilmington, Delaware 19801

Re:    In re: Finova Capital Corporation, et al.
       Case No. 01-0698

Dear Judge Walsh:

I am writing as counsel to the Equity Committee regarding the Court's letter of December 2, 2005, in which the Court amplified its ruling on the legal position of the Equity Committee respecting the Debtor's motion to clarify. We are hopeful that, after reviewing this letter, the Court will reconsider its expressed view that the use by the Equity Committee of ellipses in quoting a section of the Debtor's disclosure statement was "misleading," a proposition that is of concern to the Equity Committee's lawyers because such would be both wholly at odds with their general commitment to professional conduct, and contrary to how they believe they specifically have acted in this case. We do not herein seek to reargue the motion; our only purpose is to address the Court's belief that it was misled.

As the Court notes, a section of the disclosure statement addresses the risks associated with the inadequacy of post-confirmation cash flow. The Equity Committee – for the sake of clarity only – edited this section of its brief to accurately state that the cash flow risk could affect distributions to both Senior Noteholders and equity security holders. The Court, in its letter, says that the "main point" of this disclosure was related to risk to a third type of recipient, those of so-called "contingent interest," whose mention in the disclosure statement was excised from our quotation.

We respectfully disagree with the Court's conclusion in this regard. Briefly stated, the basis for our view is that the equity distributions at issue were a part of the Fifth Priority in the waterfall, while contingent interest payments were a Seventh Priority, and the latter thereby were junior and subordinated to the right to receive the Equity payments at issue here.

NYDOCS1-805276.2

ANDERSON KILL & OLICK, P.C.

The Honorable Peter J. Walsh
December 19, 2005
Page 2

To elaborate on the foregoing, we hope that the Court would agree that, as we believe the disclosure statement makes clear, cash flow risk potentially affected every party expecting a future distribution from the Debtor. Our view was that other constituencies being at cash flow risk did not mean that Equity was not similarly affected.

However, the provision of the disclosure statement which is at issue notes that several participants in the waterfall of distributions set forth in the Indenture for the New Senior Notes were susceptible to risks associated with the ability of the Debtor's subsidiaries to upstream cash, as distinct from a pure solvency risk. This risk, as outlined in Section VII.D.3 of the Disclosure Statement, applied to the intended recipients of distributions in each of the Fifth, Sixth and Seventh Tranches. The Indenture places the 95% distribution for Senior Noteholders and the disputed 5% distribution for Equity in the well-discussed Fifth Tranche. Distributions of "contingent interest" were placed in the Seventh Tranche of the waterfall, which tranche was not at issue. Because the relevant Fifth Tranche references both Senior Notes and Equity, those are the parties that we mentioned in our edited quotation.

We of course agree with the Court that the Equity Committee's brief edited out the risk to payment of contingent interest when we made our argument concerning the meaning of the text and headings of the disclosure statement section. However, that editing was solely the consequence of our belief that to introduce the concept of contingent interest would serve no purpose given that such payments both were well-below the relevant waterfall level and were not at issue (having not been raised by any party).

Our use of ellipses in this context was not to mislead; it was done entirely for clarity and simplicity. If anything, the fact that contingent interest payments are junior to the equity distributions at issue would tend to support the Committee's position rather than to undermine it.

Again, we must reiterate in the strongest possible terms that the Equity Committee did not intend to mislead the Court when it quoted the disclosure statement in this abbreviated fashion. Our views respecting interpretation of the language at issue remain sincerely held.

ANDERSON KILL & OLICK, P.C.

The Honorable Peter J. Walsh
December 19, 2005
Page 3

      The Court has made clear its opinion that Finova equity sits at the bottom of the hierarchy of distributions under the Finova plan.  For reasons that we articulated in our papers and in open court, we respectfully disagree.  We continue to believe that we properly and fairly expressed in our papers the bases for our views.

                    Respectfully,

                    *Mark Silverschotz/jma*
                    Mark D. Silverschotz

MDS

cc:    Mark D. Collins, Esq.
       Jonathan M. Landers, Esq.
       William D. Sullivan, Esq.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Chapter 11 |
| FINOVA CAPITAL CORP., | ) | |
| | ) | Bankruptcy Case No. 01-0698 (PJW) |
| Reorganized Debtor. | ) | Jointly Administered |
| | ) | |
| | ) | Related Docket No.: 100 |

## <u>ORDER GRANTING LEAVE TO APPEAL</u>

This matter having come before the District Court upon the *Motion Of The Official Committee Of Equity Securities Holders  For Leave To Appeal Bankruptcy Court's Order Regarding Debtors' Motion Requesting Clarification Of Confirmed Chapter 11 Plan*, and the District Court being sufficiently advised:

IT IS HEREBY ORDERED that the Official Committee of Equity Securities Holders be and hereby is granted permission to appeal from the Bankruptcy Court's *Order Regarding Debtors' Motion Requesting Clarification of Confirmed Chapter 11 Plan,* entered February 1, 2006 [D.I. 100] ("Bankruptcy Court Order"), and the Bankruptcy Court Order shall be treated as a final order for purposes of this appeal.

_____

United States District Judge

**TRANSMITTAL SHEET FOR MOTION FOR LEAVE TO APPEAL SUBMITTED
TO U.S. DISTRICT COURT**

**Bankruptcy Case #:01-698 PJW**

Deputy Clerk **Transferring Motion For Leave Appeal:** Renee Kuesel

**Cause of Appeal:** Order Regarding Debtors' Motion Requesting Clarification of Confirmed
Chapter 11 Plan. (No. 100 Filed 2/1/06), Motion for Leave to Appeal. (No.104 Filed 2/10/06)

**Documents being transmitted:** Docket #100 Order, Docket #102 Notice of Appeal, Docket
#104 Motion for Leave to Appeal, Docket #109 Motion to Strike, Docket #110 Memorandum of
Law.

**Appellant Counsel:**

**Committee of Equity Security Holders,** *Committee of Equity Security Holders
Creditor Committee*

**William David Sullivan**
Buchanan Ingersoll PC
The Nemours Building
1007 N. Orange Street
Suite 1110
Wilmington, DE 19801
USA
302-428-5500
Fax : 302-428-3996
Email: sullivanwd@bipc.com

**Appellee Counsel:**

**FINOVA CAPITAL CORPO RATION**

**Jason M. Madron**
Richards, Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
302-651-7595
Fax : 302-651-7701
Email: madron@rlf.com

**Marcos Alexis Ramos**
Richards Layton & Finger, PA
One Rodney Square
PO Box 551
Wilmington, DE 19899
302-651-7700
Fax : 302-651-7701
Email: ramos@rlf.com

**Mark D. Collins**
Richards Layton & Finger
One Rodney Square
PO Box 551
Wilmington, DE 19899
302 651-7531
Fax : 302-651-7701
Email: collins@RLF.com

**Michael Joseph Merchant**
Richards Layton & Finger, P.A.
One Rodney Square
P.O. Box 551
Wilmington, DE 19899
USA
302-651-7700
Fax : 302-651-7701
Email: merchant@rlf.com

**Rebecca L. Booth**
Richards Layton & Finger
One Rodney Square
PO Box 551
Wilmington, DE 19899
302-651-7700
Fax : 302-651-7701
Email: booth@rlf.com

-